FILED
2009 Nov-04  PM 12:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| SCOTT A. CHAMBERS and JOHN C. BURNETTE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MERRILL LYNCH & CO., INC., MERRILL LYNCH, PIERCE, FENNER & SMITH, BANK OF AMERICA CORPORATION,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  No.: _____ |

## NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT
## COURT FOR THE NORTHERN DISTRICT OF ALABAMA

Defendants Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith, and Bank

of America Corporation hereby give notice of removal to this Court of the above-captioned

action, brought in the Circuit Court of Jefferson County, Alabama at Case No. CV-2009-903163.

Removal is based on 28 U.S.C. §§ 1332(a), 1332(d), 1441, and 1453.

As grounds for removal, Defendants state the following:

### BACKGROUND

1.      Merrill Lynch & Co., Inc. is a corporation organized under the laws of the State of

Delaware with its main office in the State of North Carolina. *See* Ex. A, Declaration of Margaret

E. Nelson ("Nelson Decl.") at ¶ 3; *see also* Ex. B, Complaint at ¶ 4.  Merrill Lynch, Pierce,

Fenner & Smith, Incorporated, a registered broker and dealer, is a corporation organized under

the laws of the State of Delaware with its main office in the State of New York. *See* Ex. A,

Nelson Decl. at ¶ 5; *see also* Ex. B, Complaint at ¶ 3.  Bank of America Corporation is a

corporation organized under the laws of the State of Delaware with its main office in the State of North Carolina. *See* Ex. A, Nelson Decl. at ¶ 6; *see also* Ex. B, Complaint at ¶ 4.

2.    On or about October 2, 2009, Plaintiffs Scott A. Chambers and John C. Burnette (the "Named Plaintiffs"), on behalf of themselves and a purported nationwide class, filed a putative class action complaint (the "Complaint") in the Circuit Court of Jefferson County, Alabama (the "State Court Action"). The State Court Action was assigned Case No. CV-2009-903163.

3.    Named Plaintiffs allege that they are residents of Jefferson County, Alabama. *See* Ex. B, Complaint at ¶ 1.

4.    Named Plaintiffs allege, *inter alia*, that:

    a.    they were employed as Financial Advisors ("FAs") at Merrill Lynch's Birmingham, Alabama office (*id.* at ¶¶ 1, 2);

    b.    during their employment with Merrill Lynch, Named Plaintiffs participated in both the "Merrill Lynch Growth Award Plan for Financial Advisors" (the "GAP") and the Financial Advisory Capital Accumulation Award Plan (the "FACAAP"), which Named Plaintiffs allege to be "deferred compensation plans" (*id.* at ¶¶ 6, 9);

    c.    under both the GAP and the FACAAP, a participant is entitled to certain cash distributions when (i) there is a "Change in Control" of Merrill Lynch and (ii) the participant's employment is terminated by Merrill Lynch without cause or by the participant for "Good Reason" (*id.* at ¶¶ 6-11);

    d.    on January 1, 2009, Bank of America acquired Merrill Lynch (*id.* at ¶ 5);

    e.    Named Plaintiffs resigned from Merrill Lynch for "good reason" (*id.* at ¶¶ 14-15);

      f.      thousands of financial advisors have terminated their employment with Merrill Lynch for "good reason" since Bank of America's acquisition of Merrill Lynch (*id.* at ¶ 16); and

      g.      Defendants have not paid Named Plaintiffs amounts due under the GAP or FACAAP (*id.* at ¶ 17).

Based upon these allegations, Mr. Barkwell asserts four causes of action: (1) breach of agreement – GAP; (2) breach of agreement – FACAAP; (3) breach of fiduciary duty; and (4) declaratory and injunctive relief.

      5.      In accordance with the terms of the GAP agreement, the value of Mr. Chambers' and Mr. Burnette's respective GAP accounts were made available to them on a daily basis through participant statements maintained on Merrill Lynch's intranet system.[1] *See* Ex. A, Nelson Dec. at ¶¶ 10 & 11, Ex. 3 & 4; *see also* Nelson Dec. at ¶ 8, Ex. 1, GAP agreement.

      a.      Per the participant statement relating to Mr. Burnette's GAP account, as of March 13, 2009, the date of his resignation from Merrill Lynch, *see* Ex. B, Complaint at ¶ 15, Mr. Burnette had accumulated $12,359.69 in total alleged "deferred compensation" relating to the GAP. *See* Ex. A, Nelson Dec. at ¶ 10, Ex. 3.

      b.      Per the participant statement relating to Mr. Chambers' GAP account, as of March 27, 2009, the date of his resignation from Merrill Lynch, *see* Ex. B, Complaint at ¶ 14, Mr. Chambers had accumulated $20,256.23 in total alleged "deferred compensation" relating to the GAP. *See* Ex. A, Nelson Dec. at ¶ 11, Ex. 4.

---

[1]    In determining the propriety of removal, the court may consider evidence specifying damages "arising from a source such as a contract provision whether or not the defendant received the contract from the plaintiff." *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1214 n.66 (11th Cir. 2008)

6.      In accordance with the terms of the FACAAP agreement, the value of

Mr. Chambers' and Mr. Burnette's respective FACAAP accounts were made available to them

on a daily basis through participant statements maintained on Merrill Lynch's intranet system.

*See* Ex. A, Nelson Dec. at ¶¶ 12 & 13, Ex. 5 & 6; *see also* Nelson Dec. at ¶ 9, Ex. 2, FACAAP

agreement.

a.      Per the participant statement relating to Mr. Burnette's FACAAP account,

as of March 13, 2009, the date of his resignation from Merrill Lynch, *see* Ex. B,

Complaint at ¶ 15, Mr. Burnette had accumulated $4,664.55 in total alleged "deferred

compensation" relating to the FACAAP.  *See* Ex. A, Nelson Dec. at ¶ 12, Ex. 5.

b.      Per the participant statement relating to Mr. Chambers' FACAAP account,

as of March 27, 2009, the date of his resignation from Merrill Lynch, *see* Ex. B,

Complaint at ¶ 14, Mr. Chambers had accumulated $46,489.59 in total alleged "deferred

compensation" relating to the FACAAP.  *See* Ex. A, Nelson Dec. at ¶ 13, Ex. 6.

7.      Named Plaintiffs request various types of alleged relief in their Complaint,

including declaratory, equitable, and injunctive relief; damages consisting of an award of "all

compensation and lost;" punitive damages; prejudgment interest; and attorneys' fees, costs, and

disbursements. *Id.* at ¶ 34.

8.      Named Plaintiffs bring their claims purportedly on their own behalf and on behalf

of a putative nationwide class of persons consisting of all "FAs of Merrill Lynch/Bank of

America in the United States who have been subjected to and harmed by Defendants' breach of

the deferred compensation plans." *Id.* at ¶ 19.

## DIVERSITY JURISDICTION

9. In establishing the propriety of removal, the standard for stating a plausible claim for relief under Rule 8 of the Federal Rules of Civil Procedure applies. *See Lowery*, 483 F.3d at 1216-17, n.73, n.74 (11th Cir. 2008). Accordingly, a district court may use its "judicial experience and common sense" in determining whether the jurisdictional requirements are met. *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."); *see also Roe v. Michelin N. Am., Inc.*, 637 F. Supp. 2d 995, 999 (M.D. Ala. 2009).

10. Original jurisdiction exists in this Court based upon diversity of citizenship and the amount in controversy. Pursuant to 28 U.S.C. § 1332(a), United States District Courts have jurisdiction over all civil actions between citizens of different states and where the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Citizenship of the Parties. In the putative class action context, § 1332(a)'s "diversity" requirement is satisfied where each of the named plaintiffs is diverse from each of the defendants. *See Snyder v. Harris*, 394 U.S. 332, 340 (1969); *Supreme Tribe of Ben-Hur v. Cauble*, 255 U.S. 356, 366-67 (1921); *Lowery*, 483 F.3d at 1194 n.24; *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1288-89 (11th Cir. 1998). For diversity purposes, a corporation is "a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Therefore, as set out in Paragraph 1, *supra*, Merrill Lynch & Co. is a citizen of the State of Delaware and the State of North Carolina; Merrill Lynch, Pierce, Fenner & Smith, Incorporated is a citizen of the State of Delaware and the State of New York; and Bank of America is a citizen of the State of Delaware and the State of

North Carolina. By contrast, Named Plaintiffs are citizens of the State of Alabama. Thus, each of the Defendants is a citizen of a state different from each of the Named Plaintiffs.

12.     Amount in Controversy. In the putative class action context, the amount-in-controversy requirement is satisfied where the value of the claims of at least one of the named plaintiffs is $75,000 or more. *See Exxon Mobil Corp. v. Allapattah Serv., Inc.*, 545 U.S. 546, (2005), *affirming Allapattah Serv., Inc. v. Exxon Mobil Corp.*, 333 F.3d 1248, 1256 (11th Cir. 2003). Here, at least one of the Named Plaintiffs' claims – those of Mr. Chambers – satisfy the $75,000 amount-in-controversy requirement.

    a.     Named Plaintiffs are seeking, *inter alia*, an award consisting of the "full value of all compensation and benefits" allegedly lost as a result of Defendants' alleged conduct and punitive damages. *See* Ex. B, Complaint at ¶ 34. Mr. Chambers' alleged "deferred compensation" relating to the GAP allegedly lost as a result of Defendants' alleged conduct totals at least $20,256.23, and his alleged "deferred compensation" relating to the FACAAP allegedly lost as a result of Defendants' alleged conduct totals at least $46,489.59. *See* Ex. A, Nelson Dec. at ¶¶ 11 & 13, Ex. 4 & 6. Accordingly, Mr. Chambers is seeking at least $66,745.82 in alleged "deferred compensation" lost as a result of Defendants' alleged conduct.

    b.     In addition to the amount of alleged "deferred compensation" lost, Named Plaintiffs also seek an award of punitive damages. *See* Ex. B, Complaint at ¶ 34. "When determining the jurisdictional amount in controversy in diversity cases, punitive damages must be considered, unless it is apparent to a legal certainty that such cannot be recovered." *Holley Equip. Co. v. Credit Alliance Corp.*, 821 F.2d 1531, 1535 (11th 1987) (internal citations and footnote omitted). Here, a punitive damages award of merely

$8,254.19 – an amount that is less than thirteen percent (13%) of the amount of alleged "deferred compensation" lost by Mr. Chambers – would push the amount in controversy relating to Mr. Chambers' claims across the $75,000 jurisdictional threshold. Courts have recognized that, in Alabama, punitive damages awards often substantially exceed the amount of compensatory damages awards. *See, e.g., Henry v. Nationwide Ins. Co.,* No. 06-0612, 2007 WL 2409817, at *2 (S.D. Ala. Aug. 22, 2007) (citing *Davis v. Franklin Life Ins. Co.,* 71 F. Supp. 2d 1197, 1200 (M.D. Ala. 1999)); *Smith v. Equitable Life Assur. Co. of U.S.,* 148 F. Supp. 2d 1247, 1256 (N.D. Ala. 2001).

Thus, the value of Mr. Chambers' claims exceeds the $75,000 amount-in-controversy threshold.

## JURISDICTION UNDER THE CLASS ACTION FAIRNESS ACT

13.     Pursuant to 28 U.S.C. §§ 1332, 1441, and 1453, as amended by the Class Action Fairness Act of 2005 ("CAFA"), a putative "class action" commenced after CAFA's effective date may be removed to the United States District Court embracing the state court where the action was filed if: (a) there is minimal diversity, requiring only that one member of the putative class be a citizen of a state different from any defendant, (b) there are at least one hundred members of the putative class, and (c) the aggregate of the claims of individual class members exceeds the sum or value of $5 million, exclusive of interest and costs. 28 U.S.C. § 1332(d).

14.     CAFA is applicable to the State Court Action because it was commenced after CAFA's 2005 effective date. *See* Notes to 28 U.S.C. §§ 1332 & 1453, ("The amendments made by this Act shall apply to any civil action commenced on or after the date of enactment of this Act," – *i.e.,* February 18, 2005) (citing Pub. L. 109-2, § 9, 119 Stat. 14).

15.     CAFA defines the term "class action" as, *inter alia*, any case "that is removed to a district court of the United States that was originally filed under a State statute or rule" similar to

Rule 23. 28 U.S.C. § 1711(2). The term "class members" is defined as those "persons who fall within the definition of the proposed or certified class in a class action." 28 U.S.C. § 1711(4).

16.     Pursuant to the express language of CAFA, the amount in controversy is determined by aggregating the alleged damages with respect to the claims of the named plaintiff and the claims of the alleged class members. 28 U.S.C. § 1332(d)(6). Congress intended this provision to substantially change the scope of federal jurisdiction so as to facilitate and favor removal of purported class actions to federal court. *See* 151 Cong. Rec. H730 (Comments of Mr. Sensenbrenner); S. Rep. No. 109-14 at 42 (2005) ("[I]f a federal court is uncertain about whether 'all matters in controversy' in a purported class action 'do not in the aggregate exceed the sum or value of $5,000,000,' the court should err in favor of exercising jurisdiction over the case.").

17.     The State Court Action is an alleged "class action" within the meaning of CAFA because it is a "class action filed under" Rule 23 of the Alabama Rules of Civil Procedure – *i.e.*, Alabama's analog to Rule 23 of the Federal Rules of Civil Procedure and a "rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. §§ 1332(d)(1)(B), 1453(a). Defendants deny, however, that this case can be certified as a class action and expressly reserve their rights to oppose any motion for class certification filed in this action.

18.     Citizenship of the Parties. The requisite minimal diversity of citizenship exists under 28 U.S.C. § 1332(d)(2)&(7). For diversity purposes, a corporation is "a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Therefore, as set out in Paragraph 1, *supra*, Merrill Lynch & Co. is a citizen of the State of Delaware and the State of North Carolina; Merrill Lynch, Pierce,

Fenner & Smith, Incorporated is a citizen of the State of Delaware and the State of New York; and Bank of America is a citizen of the State of Delaware and the State of North Carolina. By contrast, Named Plaintiffs are citizens of the State of Alabama. In addition, on information and belief, informed by the fact that Named Plaintiffs seek to represent a putative nationwide class, *see* Ex. B, Complaint at ¶ 19, at least one unnamed member of the putative class is a citizen of a state other than Delaware, New York, or North Carolina. Thus, Defendants are citizens of states different from at least one member of the putative class.

19.   Members of Putative Class. While Defendants deny that this case can be certified as a class action, based on the allegations of Named Plaintiffs' Complaint, the putative nationwide class that Named Plaintiffs are seeking to represent allegedly consists of more than 100 members. *See* Ex. B, Complaint at ¶ 16 ("Upon information and belief, after the change in control and detrimental changes made to [financial advisors'] compensation and benefit plans, *thousands* of other FAs have terminated their employment with Merrill Lynch for good reason.") (emphasis added).

20.   Amount in Controversy. Based on the allegations of Named Plaintiffs' Complaint, Named Plaintiffs on their own behalf and on behalf of the members of the putative nationwide class are seeking to recover more than $5 million in this action. Therefore, the amount in controversy requirement is satisfied. Under 28 U.S.C. § 1332(d), as added by CAFA, the amount in controversy in a putative class action is determined by aggregating the amount allegedly at issue on behalf of all members of the alleged class. 28 U.S.C. § 1332(d)(6). While Defendants deny that Named Plaintiffs or any member of the putative class are entitled to recover in any amount and that Named Plaintiffs or any member of the putative class are entitled to the relief in the various forms and amounts sought, the Complaint's allegation of a putative

nationwide class and the relief sought put at issue an aggregate amount in controversy of more than $5 million, exclusive of interest and costs.

21.     The aggregate amount in controversy is met here for at least four separate and distinct reasons:

       a.     *First*, more than $5 million is in controversy in this case based on the damages sought with respect to the alleged "deferred compensation" allegedly owed to each of the "thousands" of members of the putative nationwide class. Named Plaintiffs, on behalf of themselves and the members of the putative class, seek an award of "the full value of all compensation and benefits lost and that they will lose in the future." *See* Ex. B, Complaint at ¶ 34.

          i.     Per the participant statements relating to Mr. Burnette's and Mr. Chambers' GAP accounts, as of the dates of their respective resignations from Merrill Lynch, they had accumulated $12,359.69 and $20,256.23, respectively, in total alleged "deferred compensation" relating to the GAP. *See* Ex. A, Nelson Dec. at ¶¶ 10 & 11, Ex. 3 & 4. Based upon Defendants' investigation, the average amount of alleged "deferred compensation" relating to the GAP, which have accumulated on the accounts of FAs who have terminated their employment with Merrill Lynch since January 1, 2009, and have not waived their alleged "Good Reason" claims is approximately $16,000. *See* Ex. A, Nelson Dec. at ¶ 14.

          ii.     Per the participant statements relating to Mr. Burnette's and Mr. Chambers' FACAAP accounts, as of the dates of their respective resignations from Merrill Lynch, they had accumulated $4,664.55 and $46,489.59,

respectively, in total alleged "deferred compensation" relating to the FACAAP.
*See* Ex. A, Nelson Dec. at ¶¶ 12 & 13, Ex. 5 & 6.  Based upon Defendants'
investigation, as of December 31, 2008, the average amount of alleged "deferred
compensation" relating to the FACAAP which have accumulated on the accounts
of FAs who have terminated their employment with Merrill Lynch since January
1, 2009, and have not waived their alleged "Good Reason" claims is
approximately $36,000. *See* Ex. A, Nelson Dec. at ¶ 14.

Given that the average total amount of alleged "deferred compensation" relating to the
GAP and the FACAAP which have accumulated on the accounts of FAs who have
terminated their employment with Merrill Lynch since January 1, 2009, and have not
waived their alleged "Good Reason" claims is approximately $52,000, it would take a
class of only 97 members to meet the $5,000,000 jurisdictional threshold.  Here, Named
Plaintiffs allege that the putative class consists of "thousands" of individuals, *see* Ex. B,
Complaint at ¶ 16, a number that far exceeds that necessary to establish CAFA
jurisdiction.  Stated differently, a putative class consisting of "thousands" of individuals,
would require average alleged damages of no more than $5,000, an amount exceeded by
each of the Named Plaintiffs here and by the average class claim.

      b.     *Second*, Named Plaintiffs request an award of punitive damages. *See*
Ex. B, Complaint at ¶ 34.  "When determining the jurisdictional amount in controversy in
diversity cases, punitive damages must be considered, unless it is apparent to a legal
certainty that such cannot be recovered." *Holley Equip.*, 821 F.2d at 1535 (internal
citations and footnote omitted).  On information and belief, informed by the findings of
Alabama courts that punitive damages awards often substantially exceed the amount of

compensatory damages awards, *see, e.g., Henry*, 2007 WL 2409817, at *2; *Smith*, 148 F. Supp. 2d at 1256; *Davis*, 71 F .Supp. 2d at 1200, Named Plaintiffs are seeking punitive damages in an amount that is equal to or greater than the total amount of the alleged "deferred compensation" allegedly owed to the members of the putative class, an amount that exceeds $5 million.

      c.     *Third*, Named Plaintiffs seek declaratory relief compelling Defendants to distribute the amounts of the alleged "deferred compensation" allegedly owed to the members of the putative class. *See* Ex. B, Complaint at ¶ 33. The value of such relief to the putative nationwide class is to be treated as part of the amount in controversy for purposes of removal under CAFA. *See, e.g., Ericsson GE Mobile Communications, Inc. v. Motorola Communications & Elecs., Inc.*, 120 F.3d 216, 218-20 (11th Cir. 1997) (citations omitted) (finding that, for amount in controversy purposes, the value of injunctive or declaratory relief is the "value of the object of the litigation"). Defendants deny that Named Plaintiffs or the members of the putative class are entitled to any declaratory relief in this lawsuit. In any event, if Named Plaintiffs were granted such relief, they would obtain a benefit to the putative nationwide class of more than $5 million. *See* Ex. A, Nelson Decl. at ¶ 14.

22.     While Defendants deny that any member of the putative class is entitled to recover any relief and deny that the case is appropriate for class certification, Defendants have shown that, based on the allegations of the Complaint, the aggregate amount in controversy in this putative nationwide class action exceeds $5 million exclusive of interest and costs.[2]

---

2     Additionally, Named Plaintiffs have implicitly admitted that they are seeking an award totaling at least $10,000 per putative class member. Named Plaintiffs filed suit in the

Continued on following page

23.     Jurisdiction in this case is mandatory, not discretionary, under CAFA because it does not meet the standard for discretionary jurisdiction established in 28 U.S.C. § 1332(d)(3).

24.     Although Defendants do not bear the burden of showing that CAFA's exceptions to jurisdiction in 28 U.S.C. § 1332(d) do not apply, *see Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1164 (11th Cir. 2006) (holding that "the plaintiffs bear the burden of proving the local controversy exception to the jurisdiction otherwise established"), none of those exceptions are applicable here.

## PROCEDURAL REQUIREMENTS

25.     Removal to Proper Court. This Court is part of the "district and division" embracing the place where this action was filed – Jefferson County, Alabama. 28 U.S.C. § 1446(a).

26.     Removal is Timely. Defendants were served with the Complaint on October 8, 2009. *See* Ex. A, Nelson Decl. at ¶ 7; Ex. B, Service of Process Transmittal. Receipt of the Complaint was the first notice Defendants received of the State Court Action. This Notice of Removal is being filed with the United States District Court for the Northern District of Alabama within 30 days after Defendants' receipt of the Complaint.

---

Continued from previous page

Circuit Court of Jefferson County, Alabama. The jurisdictional minimum for a claim to be exclusive to a Circuit Court in Alabama is $10,000. Ala. Code § 12-11-30 (1975). On the Cover Sheet required to be filed with the Complaint, Named Plaintiffs state that they seek a "monetary award." *See* Ex. B, Complaint, Cover Sheet. By certifying that their case qualified to be filed at the Circuit Court level and stating that a "monetary award [is] requested," Named Plaintiffs have implicitly admitted that they seek a monetary award of at least $10,000 per putative class member. Accordingly, a putative class consisting of only 500 individuals would satisfy the CAFA jurisdictional minimum. Here, Named Plaintiffs allege that the putative nationwide class is made up of "thousands" of individuals. *See id.* at ¶ 16. Accordingly, the amount placed in controversy through the putative nationwide class alleged by Named Plaintiffs exceeds the $5 million CAFA jurisdictional minimum by millions of dollars.

27.     Pleadings and Process. Attached hereto is a copy of all process, pleadings and orders served upon Defendants in the State Court Action, *see* 28 U.S.C. § 1446(a), consisting of the following: Complaint, attached hereto as Exhibit B.

28.     Notice. Attached hereto as Exhibit C is a copy of the Notice to Named Plaintiffs of Removal, which will be promptly served upon Named Plaintiffs' counsel and filed with the Clerk of the Circuit Court of Jefferson County, Alabama. *See* 28 U.S.C. § 1446(d). Defendants will also file with the Clerk of the Circuit Court of Jefferson County, Alabama a Notice of Filing of Notice of Removal, pursuant to 28 U.S.C. § 1446(d). A copy of the Notice of Filing of Notice of Removal is attached hereto as Exhibit D.

29.     Consent to Removal. Although consent to removal is not required under CAFA, *see* 28 U.S.C. § 1453, each of the Defendants join in this removal.

30.     Signature. This Notice of Removal is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure. *See* 28 U.S.C. § 1446(a).

31.     No Bond or Verification Required. Pursuant to Section 1016 of the Judicial Improvements and Access to Justice Act of 1988, no bond is required in connection with this Notice of Removal, and this Notice need not be verified.

32.     Based upon the foregoing, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332, 1441, and 1453, as amended by CAFA, and this action is properly removed to this Court.

**WHEREFORE**, this action should proceed in the United States District Court for the Northern District of Alabama as an action properly removed thereto.

Dated:  November 3, 2009

Respectfully submitted,

By:_____

Carole G. Miller
Edward A. ("Ted") Hosp
Maynard, Cooper & Gale PC
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama  35203
Phone: 205.254.1096
Fax:  205.714.6396

*Counsel for Defendants Merrill Lynch & Co.,*
*Inc., Merrill Lynch, Pierce, Fenner & Smith,*
*and Bank of America Corporation*

*Of Counsel*

Mary J. Hackett
Catherine S. Ryan
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Phone:  412.288.3131

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Notice of Removal* was filed electronically

with the above-captioned court and that a true and correct copy was hand delivered, this 3rd day

of November, 2009, to:

Charles A. McCallum, III
R. Brent Irby
McCallum, Hoaglund, Cook & Irby, LLP
905 Montgomery Highway
Suite 201
Vestavia Hills, AL 35216

*Attorneys for Plaintiffs*

*Counsel for Defendants Merrill Lynch & Co.,
Inc., Merrill Lynch, Pierce, Fenner & Smith,
and Bank of America Corporation*

# Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

SCOTT A. CHAMBERS and JOHN C. )
BURNETTE, on behalf of themselves and all )
others similarly situated, )
                         )
                 Plaintiffs, )
                         )
v.                        )    No.: _____
                         )
MERRILL LYNCH & CO., INC., MERRILL )
LYNCH, PIERCE, FENNER & SMITH, )
BANK OF AMERICA CORPORATION, )
                         )
                 Defendants. )
                         )

## DECLARATION OF MARGARET E. NELSON

I, Margaret E. Nelson, hereby depose and say:

1.      My name is Margaret E. Nelson. I am over the age of twenty-one (21), of sound

mind, capable of making this affidavit, and personally acquainted with the facts stated herein. I

submit this declaration in connection with the Notice of Removal submitted by Defendants

Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith, and Bank of America

Corporation in the above-captioned action.

2.      I am an attorney at law duly licensed to practice in the State of New York. I am

currently employed in New York by Merrill Lynch & Co., Inc. My position is First Vice

President – Compensation/HR Counsel. I make this Declaration based upon my personal

knowledge, my review of company records, and my communications with company employees,

and am competent to testify if called upon as a witness herein.

3.      On September 15, 2008, Merrill Lynch & Co., Inc. and Bank of America

Corporation executed and entered into a merger agreement whereby the two companies agreed to

work toward closure of a merger.  On January 1, 2009, Merrill Lynch & Co., Inc. merged with a subsidiary of Bank of America Corporation.

4.      Merrill Lynch & Co., Inc. is a corporation organized under the laws of the State of Delaware with its main office in the State of North Carolina.

5.      Merrill Lynch, Pierce, Fenner & Smith, Incorporated, a registered broker and dealer, is a corporation organized under the laws of the State of Delaware with its main office in the State of New York.

6.      Bank of America Corporation is a corporation organized under the laws of the State of Delaware with its main office in the State of North Carolina.

7.      Defendants Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith, Incorporated, and Bank of America Corporation were served with the Complaint in the above-captioned action on October 8, 2009.

8.      Attached hereto as Exhibit 1 is a true and correct copy of the Merrill Lynch Growth Award Plan for Financial Advisors (the "GAP").

9.      Attached hereto as Exhibit 2 is a true and correct copy of the Merrill Lynch Financial Advisor Capital Accumulation Award Plan (the "FACAAP").

10.     Attached hereto as Exhibit 3 is a true and correct copy of the participant statement made available to John C. Burnette on a daily basis through Merrill Lynch's intranet system, in accordance with the terms of the GAP.  The participant statement reflects that, as of March 13, 2009, the date of Mr. Burnette's resignation from Merrill Lynch, Mr. Burnette had accumulated $12,359.69 in total alleged "deferred compensation" relating to the GAP.

11.     Attached hereto as Exhibit 4 is a true and correct copy of the participant statement made available to Scott A. Chambers on a daily basis through Merrill Lynch's intranet system, in

accordance with the terms of the GAP. The participant statement reflects that, as of March 27, 2009, the date of Mr. Chambers' resignation from Merrill Lynch, Mr. Chambers had accumulated $20,256.23 in total alleged "deferred compensation" relating to the GAP.

12.   Attached hereto as Exhibit 5 is a true and correct copy of the participant statement made available to John C. Burnette on a daily basis through Merrill Lynch's intranet system, in accordance with the terms of the FACAAP. The participant statement reflects that, as of March 13, 2009, the date of Mr. Burnette's resignation from Merrill Lynch, Mr. Burnette had accumulated $4,664.55 in total alleged "deferred compensation" relating to the FACAAP.

13.   Attached hereto as Exhibit 6 is a true and correct copy of the participant statement made available to Scott A. Chambers on a daily basis through Merrill Lynch's intranet system, in accordance with the terms of the FACAAP. The participant statement reflects that, as of March 27, 2009, the date of Mr. Chambers' resignation from Merrill Lynch, Mr. Chambers had accumulated $46,489.59 in total alleged "deferred compensation" relating to the FACAAP.

14.   I have undertaken a review of Merrill Lynch's records and have determined the following:

a.   that, as of December 31, 2008, the average amount of alleged "deferred compensation" relating to the GAP which had accumulated on the accounts of financial advisors who have terminated their employment with Merrill Lynch since January 1, 2009, and who have not waived their alleged "Good Reason" claims is approximately $16,000.

b.   that, as of December 31, 2008, the average amount of alleged "deferred compensation" relating to the FACAAP which had accumulated on the accounts of financial advisors who have terminated their employment with Merrill Lynch since

- 3 -

January 1, 2009, and who have not waived their alleged "Good Reason" claims is approximately $36,000.

c. that, as of December 31, 2008, the total amount of alleged "deferred compensation" relating to the GAP and the FACAAP which had accumulated on the accounts of financial advisors who have terminated their employment with Merrill Lynch since January 1, 2009, and who have not waived their alleged "Good Reason" claims is more than $5,000,000.00.

## CERTIFICATE UNDER 28 USC § 1746

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 2nd day of November, 2009.

By: _____
Margaret D. Nelson
First Vice President – Compensation/HR
Counsel, Merrill Lynch & Co., Inc.

# Exhibit 1

**MERRILL LYNCH GROWTH AWARD PLAN
FOR FINANCIAL ADVISORS**

**Amended as of December 19, 2008**

# MERRILL LYNCH GROWTH AWARD PLAN
## FOR FINANCIAL ADVISORS

**Table of Contents**

ARTICLE I  NAME, PURPOSE, AND EFFECTIVE DATE ........................................................ 1

ARTICLE II DEFINITIONS ................................................................................................ 1

ARTICLE III  ELIGIBILITY ................................................................................................ 3
  3.1 Eligible Employees ................................................................................................ 3

ARTICLE IV  GROWTH AWARD ANNUAL AWARDS ........................................................ 4
  4.1 Amount of Growth Awards ...................................................................................... 4
  4.2 Crediting of Accounts ............................................................................................ 4

ARTICLE V  ADJUSTMENT OF ACCOUNTS ................................................................... 4
  5.1 Annual Adjustment of Accounts .............................................................................. 4
  5.2 Statement of Account ............................................................................................. 4

ARTICLE VI  PAYMENT OF GROWTH AWARD BALANCES............................................. 4
  6.1 General Rule.......................................................................................................... 4
  6.2 Withholding of Taxes ............................................................................................. 5
  6.3 Domestic Relations Orders .................................................................................... 5

ARTICLE VII  THE EFFECT OF TERMINATION OF EMPLOYMENTS ............................... 5
  7.1 Death .................................................................................................................... 5
  7.2 Termination Prior To Vesting Date.......................................................................... 5
  7.3 Retirement Prior to Vesting Date ............................................................................ 6
  7.4 Competition........................................................................................................... 6
  7.5 Termination for Cause or Misconduct ..................................................................... 7
  7.6 Termination of Employment After a Change in Control ............................................. 7

ARTICLE VIII  STATUS OF AWARDS AND ACCOUNTS .................................................. 10
  8. 1  NO TRUST OF FUND CREATED; GENERAL CREDITOR STATUS........................... 10
  8.2 NON-ASSIGNABILITY............................................................................................ 10
  8.3 Relationship To Other Benefits .............................................................................. 10

ARTICLE IX  BENEFICIARY............................................................................................. 11
  9.1 Designation of Beneficiary ..................................................................................... 11
  9.2 Change of Beneficiary............................................................................................ 11
  9.3 Beneficiary Death After Commencement of Payments
  9.4 Payment On Behalf Of Incompetents ..................................................................... 11

**ARTICLE X AMENDMENT AND TERMINATION** ................................................................ **11**
  10.1 Reservation of Rights................................................................................. 11

**ARTICLE XI ADMINISTRATION OF THE PLAN** ........................................................... **12**
  11.1 Powers Of The Administrator .................................................................... 12

**ARTICLE XII MISCELLANEOUS PROVISIONS**.............................................................. **12**
  12.1 Books and Records Controlling ................................................................ 112
  12.2 Successors and Assigns........................................................................... 112
  12.3 Severability ............................................................................................. 112
  12.4 Litigation.................................................................................................. 13
  12.5 Headings Are Not Controlling ................................................................... 13
  12.6 Governing Law.......................................................................................... 13

## MERRILL LYNCH GROWTH AWARD PLAN
## FOR FINANCIAL ADVISORS

### ARTICLE I

### Name, Purpose, and Effective Date

The name of the Plan is the Merrill Lynch Growth Award Plan.

The Plan, established under the Financial Advisor Compensation Program as in effect from time to time, is intended to be unfunded and maintained primarily for the purpose of providing long-term incentive compensation, subject to certain conditions, to a select group of financial advisors, who remain in the employ of the Company until completion of the period of service specified in this Plan. All decisions concerning who is to be considered eligible to participate in the Plan and who is to receive awards under this Plan are to be made by the Company.

The Plan is effective for the Plan Year commencing January 1, 2002, and each Plan Year thereafter.

### ARTICLE II

### Definitions

Unless otherwise required by the context, each of the following terms shall have the meaning indicated for that term:

"*Account*" means a book reserve established in the name of an eligible employee by MLPF&S, to which the Award or Awards granted to such eligible employee will be credited.

"*Account Balance*" means, as of any date, vested portion of all Growth Award credited to a Participant's Account adjusted in accordance with Section 5.1 to reflect the Growth Rate and any payments made from the Account prior to that date.

*Administrator*" means the Head of Human Resources of ML & Co., or his or her functional successor.

"*Advisory Division Administration*" means the appropriate members of management of the domestic Advisory Division of MLPF&S or its functional successor.

"*Affiliate*" means any corporation partnership, or other organization of which ML & Co. owns or controls, directly or indirectly, not less than 50% of the total combined voting power of all classes of stock or other equity interest.

"*Award Date*" means a date, established by Advisory Division Administration with respect to each Award, as of which such Award will be credited to the Account.

1

"*Award Year*" means the calendar year in which an Award Date falls.

"*Beneficiary*" means any person(s) or entity(ies) designated as such in accordance with Article IX.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time.

"*Company*" means ML & Co. and all of its Affiliates.

"*Disability*" means a physical or mental impairment of a Participant which counts towards the individual's satisfaction of the waiting period under the ML & Co. Basic Long Term Disability Plan, as amended from time to time, and which thereafter entitles the individual to receive benefits under that plan.

"*Eligible Employee*" means, for a given Plan Year, an Employee who (a) at the end of the performance period is a Global Wealth Management Employee (regardless of whether you continue to be a Global Wealth Management Employee at the time of grant, (b) you meet the eligibility criteria determined pursuant to Section 3(b), (c) with respect to such Production Credits, is paid from the Company's domestic based payroll (but is not a U.S. citizen or "green card" holder who is employed outside the United States); and (d) as of the date of grant, your employment with the Company has not terminated for any reason other than, death, Retirement or Rule 65

"*Employee*" means a financial advisor or any other employee group that the Administrator, in his or her sole discretion, determines are employees for purposes of eligibility for Annual Awards under the Plan. An individual who held such position during a Plan Year but who transfers to another position within the Company shall continue to be an Employee with respect to such Plan Year as long as his or her employment with the Company continues. No individual who would otherwise be eligible for an Annual Award but who is not an employee of the Company at the date of grant shall be entitled to an Annual Award under the Plan unless such individual's employment was terminated as a result of death, Retirement or Rule 65.

"*Financial Advisor*" means a domestic financial advisor employee of MLPF&S

"*Fiscal Year*" for a given Plan Year means the annual period used by ML & Co. for financial accounting purposes that ends with or prior to December 31 of that Plan Year.

"*Growth Award*" means an award determined by the Advisory Division Administration for credit to a Participant's Account under the plan.

"*Growth Rate*" means with respect to an individual Financial Advisor, for each Growth Award shall mean the higher of (A) the percentage (which shall not exceed 20%; provided that, qualifications are met) represented by the increase in such individual Financial Advisor's revenue growth over the prior Fiscal Year' revenue growth, as determined by Advisory Division Administration or (B) 2%.

"*Key Employee*" any employee who has been designated by ML & Co. to be one of the 50 highest paid employees (based on W-2 income) as of the most recently completed fiscal year.

"*ML & Co.*" means Merrill Lynch & Co., Inc.

"*MLPF&S*" means Merrill Lynch, Pierce, Fenner & Smith Incorporated.

"*Participant*" for a given Plan Year means an Eligible Employee who has satisfied the criteria set forth in Article III for receiving a Growth Award.

"*Plan*" means this Merrill Lynch Growth Plan for Selected Financial Advisors.

"*Plan Year*" means a calendar year commencing on January 1, 2002, or on any January 1 thereafter.

"*Retirement.*" You will be deemed to have reached "Retirement" if your employment with the Company terminates other than for cause or misconduct (i) on or after you have attained your 65th birthday, or (ii) on or after your 55th birthday and you have completed at least 10 years of service, including approved leaves of absence of one year or less.

"*Rule of 65*" You will be deemed to be eligible for the Rule of 65 contained in Section if your employment with the Company terminates other than for cause or misconduct (i) on or after you have (A) completed at least 20 years of service with the Company, including approved leaves of absence of one year or less, and (B) your combined length of service with the Company and your age equals at least 65, or (ii) at any age with the express approval of the Advisory Division Administration, in its sole discretion, upon a recommendation by the management of MLPF&S, in its sole discretion.   (Participants should be aware that such recommendations will be considered only in exceptional cases and will not be made for employees who are eligible for Retirement under the plan).

"*Production Credits*" of an Employee for a given Plan Year means the production credits of such Employee for the applicable Fiscal Year as determined under the Financial Advisor compensation plan applicable to such Employee as in effect from time to time.

"*Vesting Date*" means for any individual Award means a date that is four full years after the Award has been granted. Prior to the Vesting Date, the Award shall be cancelled in the event that the Participant's employment terminates for cause or the Participant' terminates his or her employment (other than by reason of death, Disability, Retirement or the Rule of 65).

"*Years of Service*" means the number of "years of service" reflected on the records of the Company for purposes of determining the Participant's rights under the Merrill Lynch & Co., Inc. Retirement Accumulation Plan.


## ARTICLE III

## ELIGIBILITY

### 3.1. Eligible Employees.

(a) **General Rule.** An employee will be eligible to receive award if he or she (i) was employed during the Performance Period as a Financial Advisor (regardless of whether he or she continues to be a Financial Advisor at the time of grant), (ii) he or she met the applicable Growth Award criteria determined by Advisory Division Administration,using the criteria described below, and (iii) as of the date of grant, his or her employment with the Company has not terminated for any reason other than death, the Rule 65 or Retirement.

(b)     **Criteria for Awards.**  The performance criteria for Growth Awards will be established periodically by the Advisory Division.  The criteria for Awards may vary from Performance Period to Performance Period and according to type of performance, and may be announced prior to, during, or following the applicable Performance Period.  An Award will generally be stated as an amount equal to a percentage of achievement against established goals during a Performance Period.  A Growth Award may, however, be a fixed dollar amount and the amount of Growth Awards may vary according to such factors as are established periodically by the Advisory Division.

## ARTICLE IV

### Growth Awards

**4.1     Amount of Growth Awards**

Growth Awards under this Plan shall be made for a Plan Year only to Eligible Employees who are Participants for the Plan Year.  The amount of each Participant's Growth Award shall be determined in accordance with the criteria in effect for the Performance Period to which the Award relates.

**4.2     Crediting of Accounts**

A Participant's Annual Award for a Plan Year shall be credited to the Participant's Account as soon as practicable (but in no event later than 120 days) after the last day of the applicable Fiscal Year.

## ARTICLE V

### Adjustment of Accounts

**5.1     Adjustment of Annual Awards**

Each Annual Award shall be increased annually to by the higher of the Participant's Growth Rate (not to exceed 20%) or 2%. The adjustment shall be made as soon as practicable (but in no event later than 120 days) after the last day of the applicable Fiscal Year.

**5.2     Statement of Account**

Each Participant for whom an Account is maintained under the Plan will be able to access account balance information via the Merrill Lynch website.

## ARTICLE VI

## Payment of Growth Award Balances

### 6. 1    General Rule

Subject to Article VII below, a Participant's Individual Growth Awards shall be paid as soon a practicable after the Vesting Date for the particular Growth Awards (but in no event later than 2½ months following the Vesting Date.  Payment of unvested Growth Awards shall be made only upon a Participant's death.  In the case of Termination due to Retirement, where the Participant is not deemed to be in Competition under Section 7.4 and is not a Key Employee: (a) the outstanding Awards  shall vest and be paid in two annual installments, the first payment of which shall be made  with 2½ months following  the end of the calendar year in which the Retirement occurs (or if Retirement occurs prior to the grant of an Annual Award, the first installment shall vest and be paid as soon as practicable (but in no event later than 2½ months following the calendar year in which the  grant is made and the remainder of which shall be vest and be paid as soon a practicable (but in no event later than 2½ months following the  the end of the immediately subsequent calendar year(s) (the vesting of each such installment  will be calculated based on 50% of the Award) and  (b) in case of death, a then the unpaid balance of the Account will vest be paid to the Beneficiary in a single sum as soon as practicable (but in no event later than 2½ months) following the Participant's death. Notwithstanding the foregoing, if the value of any Award as of the first day of the month in which the Retirement occurs is less than $500, such Award will be paid in a lump sum as soon as practicable (but in no event later than 2 ½ months) after Retirement.

Notwithstanding the previous paragraph, in the event that any Participant is a Key Employee, payments to such Participant upon Retirement shall not occur no earlier than six months following the date of such Participant's termination of employment.


A Participant's Account Balance may be further deferred if the Participant meets **all of** the eligibility requirements for any other deferred compensation plan that, in the discretion of the Administrator, may be offered by the Company. In such event a Participant may elect to defer amounts otherwise payable under this Plan under such other plan filling out such forms as the Administrator may determine in the calendar year prior to the calendar year immediately preceding the date on which such amounts would otherwise be payable. Any election to be made shall not defer the relevant award for less than 5 years from the date on which the Award would have otherwise been paid.

### 6.2 Withholding of Taxes

The Company will deduct or withhold from any amounts to be credited to an Account, or from any payments to be made hereunder, any federal, state, local income or employment taxes as required under applicable laws to be withheld, or require the Participant or the Beneficiary to pay any such amount, or the balance of any such amount.

### 6.3    Domestic Relations Orders.

ML & Co. will pay to, or to the Participant for the benefit of, the Participant's spouse or former spouse, the portion of the Participant's Vested Growth Awards specified in a valid court order entered in a domestic relations proceeding involving the Participant's divorce or legal separation.  Such payment will be made net of any amounts the Company may be required to

withhold under applicable federal, state or local law. Growth Awards that have not vested are not the property of the Participant and are NOT permitted to be paid. The Company shall be entitled to withhold from the remaining <u>Vested</u> Growth Awards payable to the Participant amounts required under applicable federal, state or local law to be withheld from the Participant in connection with a payment to the Participant's spouse.

## ARTICLE VII

## The Effect of Termination of Employment

### 7.1 Death

Upon the death of a Participant prior to the Vesting Date, then his or her Growth Awards will be deemed to be 100% vested and the Account Balance will be paid to his or her designated beneficiary or estate as soon as practicable (but in no event later than 2½ months) following his or her death.

### 7.2    Termination Prior to the Vesting Date

A Participant's Growth Awards shall cease to vest, shall not be payable to the Participant and will be cancelled in the event of the Participant's Termination of employment with the Company for any reason other than his or her death, Rule 65 or Retirement prior to the Vesting Date for the relevant Growth Awards

**(a)    Rule of 65.** If a Participant's employment terminates and he or she qualifies for the Rule of 65, the Growth Awards granted to the Participant will continue to be outstanding and to vest in accordance with their original terms (except that a 2% floor will only be applied for one full year following the date of termination) and provided that the Growth Awards will cease to vest  and will be cancelled and eliminated in the event that  the Participant commences employment or become affiliated in any way with a company (including self-employment) determined by the Advisory Division (or its designee) to be a retail brokerage competitor of the Company or an Affiliate.

**(b)    Disability.** If a Participant qualifies for Disability, the Growth Awards granted to the Participant will continue to be outstanding and to vest in accordance with their original terms (except that a 2% floor will only be applied for one full year following the date of termination) and provided that the Growth Awards will cease to be eligible for continued vesting and will be eliminated if the Participant commences employment or become affiliated in any way with a company (including self-employment) determined by the Advisory Division (or its designee) to be a retail brokerage competitor of the Company or an Affiliate.

### 7.3  Retirement Prior to the Vesting Date

If a Participant terminates his or her employment as a result of Retirement, unvested Growth Award(s) will vest will become payable in two installments as specified in Section 6.1 provided that the Growth Awards will cease to vest  and will be cancelled and eliminated in the event that  the Participant commences employment or become affiliated in any way with a company (including self-employment) determined by the Advisory Division (or its designee) to be a retail brokerage competitor of the Company or an Affiliate.

### 7.4    Competition

**Employment by Competitor.**  Notwithstanding the foregoing, if, within two years of the date of a Participant's Retirement, or at any time after such two-year period if amounts are still payable as provided in Section 6.1 above, the Participant commences employment or become affiliated in any way with a company determined by the Advisory Division (or its designee) to be a retail brokerage competitor of the Company or an Affiliate, any amount paid under Section 6.1 shall be returned  by the Participant to the Company and all amounts that have not yet vested under Section 6.1 shall cease to vest and will be cancelled and will no longer be payable.

(a)    **Procedure.**  A Participant's Account Balance will cease to vest and be payable in the event the Advisory Division in its sole discretion, determines that the Participant has been in Competition with the Company at any time during the period ending four years after the Participant's termination as a result of Retirement, Disability or the Rule of 65.  The Account Balance will be cancelled and the Participant shall have no further interest in his or her Account Balance from the date the Administrator makes such a determination and notifies the Participant at his or her last known address on the books and records of the Company, and no further payments of any award amounts  under the Plan will be made to the Participant and his or her Beneficiary.

(b)    **Competition Defined.**  For purposes of Section 7.4, "Competition" means the Participant's application for or acceptance of Employment with, or direct or indirect inducement or recruitment of any other employee of the Company to apply for or accept Employment with, any other person or entity (including self-employment) determined by the Advisory Division (or its designee) to be a retail brokerage competitor of the Company or an Affiliate. For purposes of this Section 7.4(b), the term "Employment" shall include the performance of services as an employee and as an independent contractor (self-employed or otherwise) or consultant.

### 7.5    Termination for Misconduct

A Participant's Account will cease to vest and will be cancelled  in the event the Administrator, in his or her sole discretion, determines that the Participant has engaged in any misconduct relating to his or her employment with the Company, including any violation of any law, regulation or Company policy.  In the event of any allegation of any such misconduct, any scheduled payment of the Account Balance will not be made unless and until the Administrator, upon consultation with the Director of Compliance of MLPF&S or his or her designee or functional successor, has determined that payment is appropriate under the circumstances.

### 7.6    Termination of Employment Following a Change in Control

(a)    **Payment Following a Change in Control.**  Any other provision of this Plan to the contrary notwithstanding, in the event that a Change in Control of ML & Co. occurs and thereafter a Participant's employment is terminated by the Company without Cause or by the Participant for Good Reason (as defined below), the Participant's entire Account Balance will be paid to the Participant (or to the Participant's Beneficiary in the event of death) in cash in a single sum, as promptly as possible after such termination of employment, provided however, that if the Participant has been determined by the Company to be a Key Employee, such payment shall not occur until a date that six months following such termination.

(b)    **Definition of "Change in Control".**  A "Change in Control" means a change in control of ML & Co. of a nature that would be required to be reported in response to Item 6(e) of

Schedule 14A of Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), whether or not ML & Co. is then subject to such reporting requirement; provided, however, that, without limitation, a Change in Control shall be deemed to have occurred if:

(i)  any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity, or any syndicate or group deemed to be a person under Section 14(d)(2) of the Exchange Act, other than ML & Co.'s Employee Stock Ownership Plan, is or becomes the "beneficial owner" (as defined in Rule 13d-3 of the General Rules and Regulations under the Exchange Act), directly or indirectly, of securities of ML & Co. representing 30% or more of the combined voting power of ML & Co.'s then outstanding securities entitled to vote in the election of directors of ML & Co.; or

(ii)  during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of ML & Co. and any new directors, whose election by the Board of Directors or nomination for election by the stockholders of ML & Co. was approved by a vote of at least 3/4 of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof; or

(iii)  all or substantially all of the assets of ML & Co. are liquidated or distributed.

(c)  **Agreement Concerning a Change in Control.**  If ML & Co. executes an agreement, the consummation of which would result in the occurrence of the Change in Control as described in Section 8.4(b), then, with respect to a termination of employment, unless such termination is by the Company for Cause, or by the Participant other than for Good Reason, occurring after the execution of such agreement (and, if such agreement expires or is terminated prior to consummation, prior to such expiration or termination of such agreement), a Change in Control shall be deemed to have occurred as of the date of the execution of such agreement.

(d)  **Amendments Subsequent to Change in Control.**  In the event of a Change in Control, no changes in the Plan and no adjustments, determinations or other exercises of discretion by the Administrator or ML & Co., that were made subsequent to the Change in Control and that would have the effect of diminishing a Participant's rights or payments under the Plan, or of causing the Participant to recognize income (for federal income tax purposes) with respect to the Participant's Account Balance prior to the actual distribution in cash to a Participant of such Account Balance, shall be effective.

(e)  **Cause.**  Termination of a Participant's employment by the Company for "Cause" shall mean termination upon:

(i)  the Participant's willful and continued failure substantially to perform the Participant's duties with the Company (other than any such failure resulting from the Participant's incapacity due to physical or mental illness or any such actual or anticipated failure resulting from termination by the Participant for Good Reason) after a written demand for substantial performance is delivered to the Participant by National Sales Management, which demand specifically identifies the manner in which National Sales Management believes that the Participant has not substantially performed his or her duties; or

(ii)     the willful engaging by the Participant in conduct, which is demonstrably and materially injurious to the Company, monetarily or otherwise.

No act or failure to act by the Participant shall be deemed "willful" unless done, or omitted to be done, by the Participant not in good faith and without reasonable belief that this action or omission was in the best interest of the Company.

Notwithstanding the foregoing, a Participant shall not be deemed to have been terminated for Cause unless and until there shall have been delivered to the Participant a copy of a written finding by National Sales Management (issued after reasonable notice to the Participant and an opportunity for the Participant, together with counsel, to be heard), that, in the good faith opinion of National Sales Management, the Participant was guilty of conduct set forth above in clause (i) or (ii) of the first sentence of this Section 8.4(e) and specifying the particulars thereof in detail.

(f)     "Good Reason" shall mean a Participant's termination of his or her employment with the Company if, without the Participant's written consent, any of the following circumstances shall occur:

(i)     a meaningful and detrimental alteration in the Participant's position or in the nature or status of the Participant's responsibilities from those in effect immediately prior to the Change in Control;

(ii)     a reduction by the Company of the Participant's base salary as in effect just prior to the Change in Control;

(iii)     the relocation of the office of the Company where the Participant was employed at the time of the Change in Control (the "CIC Location") to a location more than fifty miles away from the CIC Location (except for required travel on the Company's business to an extent substantially consistent with the Participant's business travel obligations just prior to the Change in Control); or

(iv)     the failure of the Company to continue to provide the Participant with benefits at least as favorable as those enjoyed by the Participant under any of the Company's pension, life insurance, medical, health and accident disability, deferred compensation or savings plans in which the Participant was participating at the time of the Change in Control, the taking of any action by the Company which would directly or indirectly materially reduce any of such benefits or deprive the Participant of any material fringe benefit enjoyed by the Participant at the time of the Change in Control, or  the failure by the Company to provide accordance with the Company's normal vacation policy in effect at the time of the Change in Control.

## ARTICLE VIII

### Status of Awards and Accounts

### 8.1    No Trust or Fund Created; General Creditor Status

Nothing contained herein and no action taken pursuant hereto will be construed to obligate the Administrator to invest any assets of ML & Co. in any Selected Benchmark Return Option, nor to establish a trust or separate fund of any kind or a fiduciary relationship between ML & Co. and a Participant, Participant's Beneficiary or estate, or any other person or entity. The Administrator may, if it so chooses, earmark any assets of ML & Co. to meet its obligations hereunder. Title to and beneficial ownership of any funds represented by the Account will at all times remain in ML & Co.; such funds will continue for all purposes to be a part of the general funds of ML & Co. and may be used for any corporate purpose. No person will, by virtue of the provisions of this Plan, have any interest whatsoever in any specific assets of the Company, including any such funds.   TO THE EXTENT THAT ANY PERSON ACQUIRES A RIGHT TO RECEIVE PAYMENTS FROM ML & CO. UNDER THIS PLAN, SUCH RIGHT WILL BE NO GREATER THAN THE RIGHT OF ANY UNSECURED GENERAL CREDITOR OF ML & CO.

### 8.2    Non-Assignability

The right of a Participant, or of any other person with reference to the Participant, to the Account Balance, or any other benefits hereunder, shall be: (a) subject to forfeiture as explained above, and (b) cannot be assigned, alienated, sold, garnished, transferred, pledged, or encumbered except by a written designation of Beneficiary under this Plan, by written will, or by the laws of descent and distribution.

### 8.3    Relationship to Other Benefits

No payment under the Plan shall be taken into account in determining any benefits under any pension, retirement, group insurance, or other employee benefit plan of the Company. The Plan shall not preclude the stockholders of ML & Co., the Board of Directors or any committee thereof, or the Company from authorizing or approving other employee benefit plans or forms of incentive compensation, nor shall it limit or prevent the continued operation of other incentive compensation plans or other employee benefit plans of the Company or the participation in any such plans by participants in the Plan.

## ARTICLE IX

### Beneficiary

**9.1    Designation of Beneficiary**

A Participant may designate, in a writing delivered to the Administrator or his or her designee before the Participant's death, a Beneficiary to receive payments in the event of the Participant's death.  The Participant may also designate a contingent Beneficiary to receive payments in accordance with this Plan if the primary Beneficiary does not survive the Participant.  The Participant may designate more than one person as the Beneficiary or contingent Beneficiary, in which case (i) no contingent Beneficiary would receive any payment unless all of the primary beneficiaries predeceased the Participant, and (ii) the surviving beneficiaries in any class shall share in any payments in proportion to the percentages of interest assigned to them by the Participant.   If the Participant dies without a surviving Beneficiary, the Participant's estate will be considered the Beneficiary.

**9.2    Change of Beneficiary**

A Participant may change the Beneficiary or contingent Beneficiary (without the consent of any prior Beneficiary) in a writing delivered to the Administrator or his or her designee before the Participant's death.  Unless otherwise stated in writing, any change in Beneficiary or contingent Beneficiary designation will automatically revoke prior such designations, as applicable, under this Plan.

**9.3    Beneficiary Death After Commencement of Payments**

If, after a Participant's death, a Beneficiary entitled to receive, or actually receiving, payments hereunder dies before receiving full payment, the Account Balance to which the Beneficiary was entitled will be paid as soon as practicable in one lump sum to such primary Beneficiary's estate.

**9.4    Payment on Behalf of Incompetents**

If, in his or her sole discretion, the Administrator finds that any person who is entitled to receive any payment hereunder is a minor or is unable to care for his or her affairs because of disability or incompetence, payment of the Account Balance may be made to anyone found by the Administrator to be the committee or other authorized representative of such person, or to be otherwise entitled to such payment, in the manner and under the conditions that the Administrator determines.  Such payment will be a complete discharge of the liabilities of the Company hereunder with respect to the amount so paid.

## ARTICLE X

### Amendment and Termination

**10.1    Reservation of Rights**

ML & Co., through the Administrator, reserves the right to amend or terminate this Plan in whole or in part, at any time for any reason; provided, however, that no such action shall reduce a Participant's Account Balance as of the effective date of that action, or otherwise deprive the Participant or a Beneficiary of any entitlement thereto.

## ARTICLE XI

### Administration of the Plan

#### 11.1    Powers Of The Administrator

The Administrator has full power, discretion and authority to interpret, construe, and administer this Plan so as to ensure that it provides deferred compensation to Participants who are members of a select group of management or highly compensated employees within the meaning of Title I of ERISA.  The Administrator's interpretations and construction hereof, and actions hereunder, including any determinations regarding the amount or recipient of any payments, will be binding and conclusive on all persons for all purposes.  The Administrator will not be liable to any person for any action taken or omitted in connection with the interpretation and administration of this Plan unless attributable to willful misconduct or lack of good faith. The Administrator may designate persons to carry out the specified responsibilities of the Administrator and shall not be liable for any act or omission of a person as designated.

#### 11.2    No Actions Permitted that Would Cause Constructive Receipt or Violate Section 409A of the Code.

Notwithstanding any provision of the Plan to the contrary, no deferral election, payment election, modification of any election under the Plan or other action with respect to the Plan shall be permitted to the extent that such election, modification or other action would violate any requirement of section 409A of the Code or would cause any Participant or Beneficiary to be in constructive receipt of any amount hereunder.

## ARTICLE XII

### Miscellaneous Provisions

#### 12.1    Books and Records Controlling

The books and records of the Company will be controlling in the event a question arises hereunder concerning the amount of Production Credits, Eligible Compensation, Annual Awards, Accounts, designations of Beneficiary(ies), or any similar matters.

#### 12.2    Successors and Assigns

The provisions of this Plan will be binding upon and inure to the benefit of the Company and its successors and assigns, the Participants and their designated Beneficiary(ies), and their respective heirs, executors, administrators, and legal representatives.

#### 12.3    Severability

If any provision of this Plan, or the application thereof, shall for any reason be invalid or unenforceable, such provision shall be limited only to the extent necessary in the circumstances to make it valid and enforceable.  In any event, the remaining provisions of this Plan will continue in full force and effect.

### 12.4   Litigation

The Company shall have the right to contest, at its expense, any ruling or decision, administrative or judicial, on an issue that is related to the Plan and that the Administrator believes to be important to the Participants, and to conduct any such contest or any litigation arising therefrom to a final decision.

### 12.5   Headings Are Not Controlling

The headings contained in this Plan are for convenience only and will not control or affect the meaning or construction of any of the terms or provisions of this Plan.

### 12.8   Governing Law

THE PLAN SHALL BE CONSTRUED AND ITS PROVISIONS ENFORCED AND ADMINISTERED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY IN SUCH STATE, AS TO ALL MATTERS, INCLUDING, BUT NOT LIMITED TO, MATTERS OF VALIDITY, CONSTRUCTION, AND PERFORMANCE.

# Exhibit 2

**MERRILL LYNCH FINANCIAL ADVISOR
CAPITAL ACCUMULATION AWARD PLAN**

**As amended through January 1, 2009**

e:\plans\plandocs\fccaap.doc

**MERRILL LYNCH FINANCIAL ADVISOR
CAPITAL ACCUMULATION AWARD PLAN**

I.  DEFINITION .................................................................................................. 1
    1.  Definitions ........................................................................................... 1

II.  ELIGIBILITY ............................................................................................... 4
    2.  Eligible Employees ............................................................................. 4

III.  THE AWARDS; APPRECIATION .............................................................. 4
    3.  The Awards ......................................................................................... 4
        (a)   Criteria for Awards ................................................................. 4
        (b)   Calculation of Amounts Payable for Awards Made Prior to January
            2003 ..................................................................................... 4
        (c)   Calculation of Amounts Payable for Awards Made in January 2003
            and Thereafter ..................................................................... 5
    4.  Shares Available Under the Plan ......................................................... 5

IV.  STATUS OF THE AWARD ......................................................................... 5
    5.  No Trust or Fund Created .................................................................... 5
    6.  Non-transferability ............................................................................... 5
    7.  Relationship to Other Benefits ............................................................ 5

V.  PAYMENT OF THE AWARD ........................................................................ 6
    8.  In General ............................................................................................ 6
    9.  Termination of Employment ................................................................. 7
        (a)   Death .................................................................................... 7
        (b)   Retirement; Employment by Competitor ............................... 7
        (i)   Awards for Performance Periods Prior to 1995 ..................... 7
        (ii)   Awards for Performance Periods After 1994 ........................ 7
        (iii)   Employment by Competitor ................................................ 8
        (iv)   Rule of 65 ......................................................................... 8
        (c)   Other Termination of Your Employment ................................ 8
        (i)   Awards for Performance Periods Prior to 1995 ..................... 8
        (ii)   Awards for Performance Periods After 1994 ........................ 9
        (iii)   Disability, Leave of Absence of Transfer ............................. 9
        (d)   Termination of Employment After a Change in Control ........... 9
        (i)   Payment Upon Change in Control ....................................... 9
        (ii)   Definition of "Change in Control" ......................................... 10
        (iii)   Agreement Concerning a Change in Control ........................ 10
        (iv)   Amendments Subsequent to Change in Control .................. 10
        (v)   Cause ................................................................................ 11
        (vi)   "Good Reason" ................................................................... 11
    10. Withholding ........................................................................................ 12
    11. Arbitration .......................................................................................... 13

12. Designation of Beneficiary ......................................................................... 13
    (a)    Designation of Beneficiary and Alternate Beneficiary ............... 13
    (b)    Change in Beneficiary............................................................... 13
    (c)    In the Event of Death of the Beneficiary During Payment........ 13

VI.  ADMINISTRATIONOF THE PLAN............................................................... 13
    13. Powers of the Committee..................................................................... 13

VII.  MISCELLANEOUS PROVISIONS .................................................................. 14
    14. Changes in Capitalization .................................................................... 14
    15. Tax Litigation....................................................................................... 14
    16. Employment Rights.............................................................................. 15
    17. Amendment of the Plan ....................................................................... 15
    18. Governing Law; Section 409A ............................................................. 15

e:\plans\plandocs\fccaap.doc

# MERRILL LYNCH FINANCIAL ADVISOR
# CAPITAL ACCUMULATION AWARD PLAN

The Merrill Lynch Financial Advisor Capital Accumulation Award Plan reflects MLPF&S's commitment to reward top producing Private Client Employees. The purpose of the Award is to establish and retain a strong sales force and professional managers by recognizing the benefits of their contributions to MLPF&S.

The terms and conditions of the Merrill Lynch Financial Advisor Capital Accumulation Award Plan are as follows:

## I. DEFINITIONS

**1.    Definitions.**

*"Account"* means a notional book reserve established in the name of an eligible employee by MLPF&S, to which the Award or Awards granted to such eligible employee will be credited.

*"Account Balance"* as of a particular date means the vested and unvested value of the Awards, including any accrued Appreciation, reflected in the Account as of that date.

*"Affiliate"* means any corporation, partnership, or other organization of which ML & Co. owns or controls, directly or indirectly, not less than 50 percent of the total combined voting power of all classes of stock or other equity interest.

*"Appreciation"* means the amounts accrued on the Awards under Section 3.

*"Awards"* means the amounts awarded pursuant to Section 3 of the Plan.

*"Award Date"* means a date, established by the Committee with respect to each Award, as of which such Award will be credited to the Account.

*"Award Year"* means the calendar year in which an Award Date falls.

*"Committee"* means the Management Development and Compensation Committee of the Board of Directors of ML & Co. or the appropriate committee of the successor by merger to ML & Co.

1

"*Common Stock*" means Merrill Lynch & Co., Inc. Common Stock, par value $1.33 1/3 per share or the common stock of ML& Co.'s successor by merger.

"*Common Stock Amount*" means the number derived by dividing the amount of an Award by the Fair Market Value of Common Stock as of the last day of the Performance Period, or such other date or period as may be established by the Committee, rounded to the nearest whole number. Such number represents the total number of shares of Common Stock you may receive on the Payment Date.

"*Company*" means ML & Co. and all of its Affiliates.

"*Disability*" You will be deemed to have incurred a "__Disability__" if you are entitled to receive benefits under the Merrill Lynch & Co., Inc. Long-Term Disability Plan.

"*Fair Market Value*" of Common Stock on any given date(s) shall be: (a) the mean of the high and low sales prices on the New York Stock Exchange Composite Tape on the date(s) in question, or, if the Common Stock shall not have been traded on any such date(s), the mean of the high and low sales prices on the New York Stock Exchange Composite Tape on the first day prior thereto on which the Common Stock was traded; _provided_, _however_, if the Distribution Date (as defined in the Rights Agreement) shall have occurred and the Rights shall then be represented by separate certificates rather than by certificates representing the Common Stock, there shall be added to such value calculated in accordance with (a) above, the mean of the high and low sales prices of the Rights on the New York Stock Exchange Composite Tape on the date(s) in question, or if the Rights shall not have been traded on any such date(s), the mean of the high and low sales prices on the New York Stock Exchange Composite Tape on the first day prior thereto on which the Rights were so traded; or (b) such other amount as may be determined by the Committee by any fair and reasonable means.

"*Fiscal Year*" means the annual period used by ML & Co. for financial accounting purposes.

"*Junior Preferred Stock*" means ML & Co.'s Series A Junior Preferred Stock, par value $1.00 per share.

"*Key Employee*" means any employee who has been designated by ML & Co. as one of the 50 highest paid employees (based on W-2 income) as of the most recently completed fiscal year.

"*Minimum Value*" means the dollar amount obtained by applying a per annum rate of 1%, compounded annually, to the amount of an Award, from and

2

including the last day of the Performance Period, or such other date as may be established by the Committee, to and including the Payment Date.

"*ML & Co.*" means Merrill Lynch & Co., Inc. or a successor corporation.

"*MLPF&S*" means Merrill Lynch, Pierce, Fenner & Smith Incorporated, a subsidiary of ML & Co.

"*Payment Calculation Date*" means, with respect to an Award, the first day of the month in which an Award first becomes payable under Section 8 or 9.

"*Payment Date*" means, with respect to any amount payable under the Plan, the date on which such amount first becomes payable.

"*Plan*" means this Merrill Lynch Financial Advisor Capital Accumulation Award Plan.

"*Performance Period*" means the period, generally a fiscal year of ML & Co., during which you generate the production/revenue or achieve the goals that are the basis of an Award.

"*Private Client Employee*" means a Financial Advisor (including a resident manager or producing manager), life market estate planning and business insurance specialist (EPBIS), broad market EPBIS, insurance planning specialist or mortgage and credit specialist, or any other employee group that the Committee, in its sole discretion, determines are private client employees for purposes of eligibility for awards under the Plan, as evidenced in the applicable Committee resolutions or instrument of grant.

"*Retirement*" Subject to Sections 8(c) and 9(b), you will be deemed to be eligible for "Retirement" if your employment with the Company terminates other than for cause or misconduct (i) on or after you have attained your 65th birthday or (ii) when you cease employment on or after your 55th birthday and you have completed at least 10 years of service, including approved leaves of absence of one year or less.

"*Rights*" mean the Rights to Purchase Units of Series A Junior Preferred Stock issued pursuant to the Rights Agreement.

"*Rights Agreement*" means the Rights Agreement dated as of December 16, 1987 between ML & Co. and Manufacturers Hanover Trust Company, Rights Agent.

"*Rule of 65*" Subject to Section 8(c) and 9(b), you will be deemed to be eligible for the Rule of 65 contained in Section 9(b)(iv) of FACAAP if your employment with the Company terminates (other than for cause or misconduct): (A) (i) on or after you have completed at least 20 years of service with the

3

e:\plans\plandocs\fccaap.doc

Company, including approved leaves of absence of one year or less, and (ii) your combined length of service with the Company and your age equals at least 65; or (B) at any age with the express approval of the Committee, in its sole discretion, upon a recommendation by the management of MLPF&S, in its sole discretion. (Participants should be aware that such recommendations will be considered only in exceptional cases); and (C) you are not eligible for "Retirement" under the Plan.

"*You*" means the individual participant in this Plan.

## II. ELIGIBILITY

### 2. Eligible Employees.

You are eligible for an Award if (i) you were, during the Performance Period, a Private Client Employee (regardless of whether you continue to be a Private Client Employee at the time of grant), (ii) you meet the applicable Award criteria determined pursuant to Section 3 (a) and (iii) as of the date of grant, your employment with the Company has not terminated for any reason other than death or Retirement.

## III. THE AWARDS; APPRECIATION

### 3. The Awards.

(a)     **Criteria for Awards.**  The criteria for Awards will be established periodically by the Committee, upon the recommendation of the management of the Company.  The criteria for Awards may vary from Performance Period to Performance Period and according to type of performance, and may be announced prior to, during, or following the applicable Performance Period. An Award will generally be stated as an amount equal to a percentage of achievement against established goals during a Performance Period.  An Award may, however, be a fixed dollar amount and the amount of Awards may vary according to such factors as are established periodically by the Committee. Awards granted will be credited to the Account as of the Award Date.

(b)     **Calculation of Amounts Payable for Awards Made Prior to January 2003.**  There shall be computed, with respect to each Award, both the cash amount and the Common Stock Amount of such Award.  If, as of the Payment Calculation Date, the then Fair Market Value of the Common Stock Amount is equal to or greater than the Minimum Value of the Common Stock Amount, you will receive the Common Stock Amount in shares of Common Stock; however, if such Fair Market Value of the Common Stock Amount as of such date is less than such Minimum Value, you will receive such Minimum Value in cash.  If shares of Common Stock are unavailable for payment under the Plan or if the Committee shall otherwise, in its sole discretion, so direct, the

4

Fair Market Value of such shares as of the Payment Calculation Date will instead be paid in cash. Fractional shares shall be paid in cash. Until receipt by you of any share of Common Stock hereunder, you will have no right, title, or interest in such share, including, without limitation, the right to receive dividends and to vote any shares.

(c) **Calculation of Amounts Payable for Awards Made in January 2003 and Thereafter.** Each award shall be converted into a Common Stock Amount of such Award. When the award is payable under the terms of the Plan, you will receive the Common Stock Amount in shares of Common Stock. Fractional shares shall be paid in cash. Until receipt by you of any share of Common Stock hereunder, you will have no right, title, or interest in such share, including, without limitation, the right to receive dividends and to vote any shares.

### 4. Shares Available Under the Plan.

The total number of shares of Common Stock that may be issued under the Plan shall be 104,000,000 subject to adjustment as provided in Section 14. After January 1, 2009, no further awards will be made under the Plan.

## IV. STATUS OF THE AWARD

### 5. No Trust or Fund Created.

Neither the Plan nor any grant made hereunder shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company and you or any other person. To the extent that any person acquires a right to receive payments from the Company pursuant to a grant under the Plan, such right shall be no greater than the right of any unsecured general creditor of the Company.

### 6. Non-transferability.

Your rights under the Plan, including the right to any amounts or shares payable, may not be assigned, pledged, or otherwise transferred except, in the event of your death, to your designated beneficiary or, in the absence of such a designation, by will or the laws of descent and distribution.

### 7. Relationship to Other Benefits.

No payment under the Plan shall be taken into account in determining any benefits under any pension, retirement, group insurance, or other employee benefit plan of the Company. The Plan shall not preclude the stockholders of ML & Co., the Board of Directors or any committee thereof, or the Company from authorizing or approving other employee benefit plans or forms of incentive compensation, nor shall it limit or prevent the continued operation of other

5

incentive compensation plans or other employee benefit plans of the Company or the participation in any such plans by participants in the Plan.

## V. PAYMENT OF THE AWARD

**8. In General.**

(a)   Subject to the provisions of Section 9 and all other requirements of the Plan, the vested Account Balance with respect to an individual year's Award, will vest and be paid to you in a lump sum (in shares of Common Stock) as soon as practicable (but in no event later than two and one-half months) following January 1 of the tenth year following the Award Year, provided that, for Awards made in and after January 2003 for Performance Years 2002 and thereafter, you will receive only the Common Stock Amount and such Common Stock Amount will vest and be paid to you as soon as practicable (but in no event later than two and one-half months) following January 1 of the eighth year following the Award Year; and provided further that for Awards made in January 2001 and January 2002 to Financial Advisors employed by International Private Client, such awards will, (i) in the case of Awards for the 2000 Performance Period, vest and be paid to you as soon as practicable (but in no event later than two and one-half months) following January 1 of the fifth year following the Award Year, and, (ii) in the case of Awards made for the 2001 Performance Period, vest and be paid to you as soon as practicable (but in no event later than two and one-half months) following January 1 of the seventh year following the Award Year.

(b) "Rule of 75" Distribution Election.  You will meet the requirements for a "Rule of 75" distribution if on or prior to December 31, 2008 you are (i) 65 years of age or older and have completed 10 years or more of service; (ii) 60 years of age or older and have completed 15 years or more of service; or (iii) 55 years of age or older and have completed 20 years or more of service.  If you meet these requirements, then, on or prior to December 31, 2008, you may make a one-time election to accelerate the payment of up to 50% your Account Balance under the Plan to a specified date in 2009 (in accordance with procedures determined by the Head of Human Resources), subject to the terms and conditions of this Section 8(b) and provided that (1) you sign a contract with the Company agreeing not to compete in any way with the business of the Company following your termination of employment and (2) that prior to such payment, your Awards are not cancelled because you are terminated for misconduct or join a retail brokerage competitor of the Company.  If you terminate your employment with the Company for Retirement prior to the date on which the Rule of 75 distribution would have been made, your one-time election will not be effective, and the regular vesting and distribution provisions of the Plan will apply.  In addition, the regular vesting and distribution provisions of the Plan will apply to the non-accelerated portion of your Account Balance.  This provision does not apply to awards made to Financial Advisors employed by International Private Client in January 2001 and January 2002 and will expire on December 31, 2008.

6

(c)   **Disqualification for Misconduct.**   Notwithstanding any other provision of this Plan (except Section 9(d), which in the event of a Change in Control shall govern in the event of a conflict), , in the event of any allegation of any misconduct on your part, including, but not limited to any violation of any law, regulation, or Company policy, payment of the vested Account Balance will be delayed until the management of the Company or its designee, upon consultation with the General Counsel's office, has, in its sole discretion, determined that either payment is appropriate under the circumstances, or that your shall be disqualified from receiving the entire Account Balance.  In the event that the management of the Company determines that you are disqualified from receiving the entire Account Balance, this disqualification shall be deemed effective as of the date of the alleged misconduct.

## 9. Termination of Employment.

(a)   **Death.**  If you die prior to payment pursuant to Section 8, then your Award(s) will be deemed to be 100% vested and the Account Balance will be paid to your beneficiary as soon as practicable.  In such event, the "Payment Calculation Date" will be deemed to be the first day of the month in which the death occurred.

(b)   **Retirement; Employment by Competitor.**  Termination of your employment (other than a termination under the circumstances covered by Section 8 (c)) when you are eligible for Retirement shall have the following effect:

(i)   **Awards for Performance Periods Prior to 1995.**  With respect to Awards granted prior to and for the 1994 Performance Period (i.e., the Performance Period ended December 30, 1994), your Award(s) will vest and be paid to you as soon as practicable after your Retirement, in which case the "Payment Calculation Date" will be deemed to be the first day of the month in which the Retirement occurred. In addition, if you have entered into a formal account transition plan with Advisory Division that does not exceed one year and transferred to an IA code for not more than one year from Retirement, your Awards will be vested and paid to you as soon as practicable after such transfer, in which case the "Payment Calculation Date will be deemed to be the first day of the month in which such transfer occurred.

(II)   **Awards for Performance Periods After 1994.**  With respect to Awards granted for Performance Periods after the 1994 Performance Period, your Account Balance will vest and become payable in two installments, the first 50% of the Account Balance will vest as of the end of the year in which Retirement occurs (or, in the case of any Award granted after Retirement, as of the Award Date) and will be payable within 75 days following the end of such year, and the remaining Account Balance will vest as of the end of the year

7

following the year in which Retirement occurs (subject to paragraph 9(b)(iii) below) and become payable within 75 days following the end of such year.

(iii)    **Employment by Competitor.**  Notwithstanding the foregoing, if, within two years of the date of your Retirement, or at any time after such two-year period if amounts are still payable to you as provided in subsection (ii) above, you commence employment or become affiliated in any way with a retail brokerage competitor of the Company or an Affiliate, you will be disqualified from receiving any remaining Account Balance and any amount paid to you under this section shall be returned to the Company and all amounts that have not yet vested under this section shall cease to vest and no longer be payable.

(iv)    **Rule of 65.**  If your employment terminates (other than a termination under the circumstances covered by Section 8(c) and you are eligible, at the time of such termination, for the Rule of 65, your Account Balance will continue to be outstanding and to be paid out upon vesting in accordance with Section 8, provided that you shall be immediately disqualified from receiving any Account Balance, if you commence employment or become affiliated in any way with a retail brokerage competitor of the Company or an Affiliate.

(c)    **Other Termination of Your Employment.**  Termination of your employment for any reason other than death or Retirement shall have the following effect:

(i)    **Awards for Performance Periods Prior to 1995.**  With respect to Awards granted prior to and for the 1994 Performance Period (i.e., the Performance Period ended December 30, 1994), you will receive only partial payment of an Award based upon the percentage of such Award that has vested as of December 31st of the year prior to the year in which the termination occurs and the remainder of the Award shall be deemed forfeited.  Vesting of your Award(s) shall occur as of the end of the day on December 31st of each year in accordance with the following schedule:

| Year | Percentage of Total Award Vested at Year-End |
|------|----------------------------------------------|
| Award Year | 0% |
| Second Year | 0% |
| Third Year | 0% |
| Fourth Year | 0% |
| Fifth Year | 50% |
| Sixth Year | 60% |
| Seventh Year | 70% |
| Eighth Year | 80% |
| Ninth Year | 90% |
| Tenth Year | 100% |

8

The vested amount will be paid to you in a lump sum as soon as practicable following such termination.  In addition, (A) the "Payment Calculation Date" will be deemed to be the first day of the month in which such termination occurred and (B) anything else in this Plan to the contrary notwithstanding, you will receive no more than the Minimum Value with respect to an Award.

(ii)    **Awards for Performance Periods After 1994**  Subject to paragraph 8(c), with respect to Awards granted for Performance Periods after 1994, if your employment terminates on or prior to the vesting date, for any reason other than death, Retirement or qualification for the Rule of 65, you will be immediately disqualified from receiving your Account Balance and such award will cease to vest and be cancelled, unless the Committee, in its sole discretion, finds that the circumstances in the particular case so warrant and allows you to retain any portion or all of your Account Balance.

(iii)    **Disability, Leave of Absence or Transfer.**    Your employment will not be considered as terminated if you are on an approved leave of absence, have incurred a Disability, or if you transfer or are transferred but remain in the employ of the Company.

(d)    **Termination of Employment After a Change in Control.**

(i)    **Payment Upon Change in Control.**    Any other provision of this Plan to the contrary notwithstanding, in the event that a Change in Control of ML & Co. occurs and thereafter your employment is terminated by the Company without Cause (as defined in Section 9(d)(v), or by you for Good Reason (as defined in Section 9(d)(vi), your Award(s) will be deemed to be 100% vested and your entire Account Balance will be paid to you (or to your beneficiary in the event of death) in cash in a lump sum, as promptly as possible after such termination of employment but, without limiting the foregoing, in no event later than 45 days thereafter.

(ii)    **Definition of "Change in Control".**  A "Change in Control" means a change in control of ML & Co. of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), whether or not ML & Co. is then subject to such reporting requirement; provided, however, that, without limitation, a Change in Control shall be deemed to have occurred if:

(A)    any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity, or any syndicate or group deemed to be a person under Section 14(d)(2) of the Exchange Act, is or becomes the "beneficial owner" (as defined in Rule 13d-3 of the General Rules and Regulations under the Exchange Act), directly or indirectly, of securities of ML &

9

Co. representing 30% or more of the combined voting power of ML & Co.'s then outstanding securities entitled to vote in the election of directors of ML & Co.; or

(B)     during any period of two consecutive years individuals who at the beginning of such period constituted the Board of Directors of ML & Co. and any new directors, whose election by the Board of Directors or nomination for election by the stockholders of ML & Co. was approved by a vote of at least 3/4 of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof; or

(C)     all or substantially all of the assets of ML & Co. are liquidated or distributed.

(iii)     **Agreement Concerning a Change in Control.** If ML & Co. executes an agreement, the consummation of which would result in the occurrence of the Change in Control as described in subparagraph (ii), then, with respect to a termination of employment, unless such termination is by the Company for Cause, or by you other than for Good Reason, occurring after the execution of such agreement (and, if such agreement expires or is terminated prior to consummation, prior to such expiration or termination of such agreement), a Change in Control shall be deemed to have occurred as of the date of the execution of such agreement.

(iv)     **Amendments Subsequent to Change in Control.** In the event of a Change in Control, no changes in the Plan and no adjustments, determinations or other exercises of discretion by the Committee or the Board of Directors, that were made subsequent to the Change in Control and that would have the effect of diminishing your rights or payments under the Plan or this Section 9(e), or of causing you to recognize income (for federal income tax purposes) with respect to your Account Balance prior to the actual distribution in cash to you of such Account Balance, shall be effective.

(v)     **Cause.** Termination of your employment by the Company for "Cause" shall mean termination upon:

(A)     your willful and continued failure substantially to perform your duties with the Company (other than any such failure resulting from your incapacity due to physical or mental illness or any such actual or anticipated failure resulting from termination by you for Good Reason) after a written demand for substantial performance is delivered to you by the Board of Directors, which demand specifically identifies the manner in which the Board of Directors believes that you have not substantially performed your duties; or

(B)     the willful engaging by you in conduct which is demonstrably and materially injurious to the Company, monetarily or otherwise.

10

e:\plans\plandocs\ccaap.doc

No act or failure to act by you shall be deemed "willful" unless done, or omitted to be done, by you not in good faith and without reasonable belief that this action or omission was in the best interest of the Company.

Notwithstanding the foregoing, you shall not be deemed to have been terminated for Cause unless and until there shall have been delivered to you a copy of a resolution duly adopted by the affirmative vote of not less than three quarters of the entire membership of the Board of Directors at a meeting of the Board called and held for such purpose (after reasonable notice to you and an opportunity for you, together with counsel, to be heard before the Board of Directors), finding that, in the good faith opinion of the Board of Directors, you were guilty of conduct set forth above in clause (A) or (B) of the first sentence of this Subsection and specifying the particulars thereof in detail.

(vi) **"Good Reason"** shall mean your termination of your employment with the Company if, without your written consent, any of the following circumstances shall occur:

(A) a meaningful and detrimental alteration in your position or in the nature or status of your responsibilities from those in effect immediately prior to the Change in Control;

(B) a reduction by the Company of your base salary as in effect just prior to the Change in Control;

(C) the relocation of the office of the Company where you were employed at the time of the Change in Control (the "CIC Location") to a location more than fifty miles away from the CIC Location, or the Company's requiring you to be based more than fifty miles away from the CIC Location (except for required travel on the Company's business to an extent substantially consistent with your business travel obligations just prior to the Change in Control);

(D) the failure of the Company to continue in effect any benefit or compensation plan, including, but not limited to, this Plan, the Company's retirement program, or the Company's Long-Term Incentive Compensation Plan, Employee Stock Purchase Plan, 1978 Incentive Equity Purchase Plan, cash incentive compensation or other plans adopted prior to the Change in Control, in which you are participating at the time of the Change in Control, unless an equitable arrangement (embodied in an ongoing substitute or alternative plan) has been made with respect to such plan in connection with the Change in Control, or the failure by the Company to continue your participation therein on at least as favorable a basis, in terms of both the amount of benefits provided and the level of your participation relative to other participants, as existed at the time of the Change in Control; or

11

(E)     the failure of the Company to continue to provide you with benefits at least as favorable as those enjoyed by you under any of the Company's pension, life insurance, medical, health and accident, disability, deferred compensation or savings plans in which you were participating at the time of the Change in Control, the taking of any action by the Company which would directly or indirectly materially reduce any of such benefits or deprive you of any material fringe benefit enjoyed by you at the time of the Change in Control, or the failure by the Company to provide you with the number of paid vacation days to which you are entitled on the basis of years of service with the Company in accordance with the Company's normal vacation policy in effect at the time of the Change in Control.

(e)     **Special Rule for Key Employees.**  Notwithstanding any provision of the Plan to the contrary, if any amount becomes payable hereunder with respect to the termination of employment of a Participant who is then a Key Employee, the payment of such amount shall not commence until the earlier of (i) the date that is six months after the date of such termination of employment, or (ii) the date of such Participant's death.

## 10. Withholding.

The Company shall have the right, before any payment is made or any shares are delivered or credited to any account, to deduct or withhold from any payment under the Plan any Federal, state, or local taxes, including transfer taxes, required by law to be withheld or to require you or your beneficiary or estate, as the case may be, to pay any amount, or the balance of any amount, required to be withheld. Upon the vesting of any Participant's Account Balance and prior to the payment of any Account Balance in shares of Common Stock, the Company shall satisfy any minimum Federal, state, local, social security, Medicare or any other tax withholding requirements that occur as a result the payment of such Account Balance by deducting from the number of whole shares of Common Stock otherwise payable, such number of shares having a Fair Market Value, on the Payment Date, equal to the minimum tax required to be withheld by the Company.

## 11. Arbitration.

Any claim or dispute concerning your individual rights or entitlements under or otherwise relating to this Plan shall be settled by arbitration before either the American Arbitration Association ("AAA" or JAMS (formerly the "Judicial Arbitration and Mediation Services") depending upon which of these forums you choose, in accordance with the Commercial Dispute Resolutions Procedures of the AAA or the Comprehensive Arbitration Rules and Procedures of JAMS, provided however, that: (1) the arbitrator shall be required to adhere to established principles of substantive law and the governing burdens of proof; (2) the arbitrator shall be prohibited for disregarding, adding to or modifying the

12

terms of the Plan; (3) the arbitrator shall be an attorney licensed to practice law who is experienced in similar matters; and (4) more than one employee or former employee may consolidate their claims and join in the same arbitration proceeding only with the consent of all the parties to the proceeding. No claim or dispute concerning rights or entitlements under or otherwise relating to the Plan may be brought or litigated in a class action. The award rendered in this arbitration shall be final and binding, and judgment upon the award may be entered in any court of competent jurisdiction.

## 12. Designation of Beneficiary.

(a) **Designation of Beneficiary and Alternate Beneficiary.** You may designate, in a writing delivered to ML & Co. before your death, a beneficiary to receive payments in the event of your death. You may also designate an alternate beneficiary to receive payments if the primary beneficiary does not survive you. You may designate more than one person as your beneficiary or alternate beneficiary, in which case such persons would receive payments as joint tenants with a right of survivorship as to the amounts not yet paid from your Account. If you die without a surviving beneficiary, then your estate will be considered your beneficiary.

(b) **Change in Beneficiary.** You may change your beneficiary or alternate beneficiary (without the consent of any prior beneficiary) in a writing delivered to ML & Co. before your death. Unless you state otherwise in writing, any change in beneficiary or alternate beneficiary will automatically revoke prior designations only of your beneficiary or only of your alternate beneficiary, as the case may be, under this Plan only; designations under other Plans will remain unaffected.

(c) **In the Event of Death of the Beneficiary During Payment.** If a beneficiary who is receiving payments hereunder dies before all of the payments have been made and if there is no surviving joint tenant, the Account Balance will be paid as soon as practicable in one lump sum to such beneficiary's estate and not to any alternate beneficiary you may have designated.

## VI. ADMINISTRATION OF THE PLAN

## 13. Powers of the Committee.

The Committee has full power and authority to interpret, construe, and administer the Plan and to adopt, amend, and rescind such rules and regulations as, in its opinion, may be advisable for the administration of the Plan. The Committee's interpretations and construction hereof, and actions hereunder, including any determinations regarding the amount or recipient of any payments and whether any amount of Common Stock payable hereunder will instead be paid in the equivalent amount of cash, will be binding and conclusive on all

13

e:\plans\plandocs\fccaap.doc

persons for all purposes. The Committee will not be liable to any person for any action taken or omitted in connection with the interpretation and administration of this Plan unless attributable to its willful misconduct or lack of good faith.

## VII. MISCELLANEOUS PROVISIONS

### 14.    Changes in Capitalization.

Any other provision of the Plan to the contrary notwithstanding (except for Section 9(d), which shall control in the event of a change in control), if any change shall occur in or affect Common Stock on account of a merger, consolidation, reorganization, stock dividend, stock split or combination, reclassification, recapitalization, or distribution to holders of Common Stock (other than cash dividends) then, without any action by the Committee, appropriate adjustments shall be made to (1) the maximum number of shares of Common Stock and Rights subject to and reserved under the Plan, and (2) the number of shares subject to or reserved for issuance under outstanding Awards. In addition, if in the opinion of the Board of Directors of ML & Co. (the "Board of Directors"), after consultation with ML & Co.'s independent public accountants, changes in ML & Co.'s accounting policies, acquisitions, divestitures, distributions, or other unusual or extraordinary items have disproportionately and materially affected the value of Common Stock, the Board of Directors shall make such adjustments, if any, that it may deem necessary or equitable, in its sole discretion, in order to preserve the benefit of this Plan for ML & Co. and its employees and stockholders, in the number of shares subject to or reserved for issuance under this Plan and in the method of calculating Appreciation.

### 15.    Tax Litigation.

The Company shall have the right to contest, at its expense, any tax ruling or decision, administrative or judicial, on any issue that is related to the Plan and that the Company believes to be important to participants in the Plan and to conduct any such contest or any litigation arising therefrom to a final decision.

### 16.    Employment Rights.

Neither the Plan nor any action taken hereunder shall be construed as giving any employee of the Company the right to become a participant, and a grant under the Plan shall not be construed as giving any participant any right to be retained in the employ of the Company.

### 17.    Amendment of the Plan.

The Board of Directors or the Committee (but no other committee of the Board of Directors) may modify, amend or terminate the Plan at any time. No such modification, amendment or termination will, without your consent,

14

e:\plans\plandocs\fccaap.doc

adversely affect your rights in relation to an Award after it has been granted to you.

## 14. Changes in Capitalization.

Any other provision of the Plan to the contrary notwithstanding (except for Section 9(d), which shall control in the event of a change in control), if any change shall occur in or affect Common Stock on account of a merger, consolidation, reorganization, stock dividend, stock split or combination, reclassification, recapitalization, or distribution to holders of Common Stock (other than cash dividends) then, without any action by the Committee, appropriate adjustments shall be made to (1) the maximum number of shares of Common Stock and Rights subject to and reserved under the Plan, and (2) the number of shares subject to or reserved for issuance under outstanding Awards. In addition, if in the opinion of the Board of Directors of ML & Co. (the "Board of Directors"), after consultation with ML & Co.'s independent public accountants, changes in ML & Co.'s accounting policies, acquisitions, divestitures, distributions, or other unusual or extraordinary items have disproportionately and materially affected the value of Common Stock, the Board of Directors shall make such adjustments, if any, that it may deem necessary or equitable, in its sole discretion, in order to preserve the benefit of this Plan for ML & Co. and its employees and stockholders, in the number of shares subject to or reserved for issuance under this Plan and in the method of calculating Appreciation.

## 18. Governing Law; Section 409A.

This Plan will be construed in accordance with and governed by the laws of the State of New York as to all matters, including, but not limited to, matters of validity, construction, and performance. Notwithstanding any provision of this Plan to the contrary, no election, time or form of payment, modification or other action with respect to the Plan shall be permitted to the extent that such election, time or form of payment, modification or other action would violate any requirement of Section 409A of the Code or the regulations thereunder.

NY1 6340466v.1

Formatted: Font: 7 pt

15

e:\plans\plandocs\fccaap.doc

# Exhibit 3

Growth Award Plan

## Growth Award(s) Statement

JACK BURNETTE   Employee ID (5 digit): 2286Y   Employee ID (9 digit): 000617078

| Award Year | Award Type | Vesting Date | Original Award | Interest (Year 1) | Interest (Year 2) | Interest (Year 3) | Interest (Year 4) | Total Award |
|---|---|---|---|---|---|---|---|---|
| 2005 | PROD | 12/31/2009 | $1,439.46 | $287.89 | $345.47 | $41.46 | $0.00 | $2,114.28 |
| 2006 | PROD | 12/31/2010 | $2,458.19 | $491.64 | $59.00 | $0.00 | $0.00 | $3,008.83 |
| 2007 | PROD | 12/31/2011 | $3,158.58 | $63.17 | $0.00 | $0.00 | $0.00 | $3,221.75 |
| 2008 | PROD | 12/31/2012 | $4,014.83 | $0.00 | $0.00 | $0.00 | $0.00 | $4,014.83 |
| Grand Total | | | $11,071.06 | $842.70 | $404.47 | $41.46 | $0.00 | $12,359.69 |

The values are not vested and will not be paid if your employment terminates for any reason other than Retirement (as defined in Growth Award Plan Doc.) or Rule 65 prior to the date on which your Awards become vested.

All Growth awards are payable in the month of February following the vesting date.

Questions:
Please consult your Manager and/or GWM Compensation @ 609-274-6777.

# Exhibit 4

Growth Award Plan

## Growth Award(s) Statement

SCOTT A. CHAMBERS   Employee ID (5 digit): 69190   Employee ID (9 digit): 000069190

| Award Year | Award Type | Vesting Date | Original Award | Interest (Year 1) | Interest (Year 2) | Interest (Year 3) | Interest (Year 4) | Total Award |
|---|---|---|---|---|---|---|---|---|
| 2005 | PROD | 12/31/2009 | $6,130.02 | $122.60 | $125.05 | $127.55 | $0.00 | $6,505.22 |
| 2006 | PROD | 12/31/2010 | $5,246.28 | $104.97 | $107.07 | $0.00 | $0.00 | $5,460.32 |
| 2007 | PROD | 12/31/2011 | $4,267.83 | $85.36 | $0.00 | $0.00 | $0.00 | $4,353.19 |
| 2008 | PROD | 12/31/2012 | $3,937.50 | $0.00 | $0.00 | $0.00 | $0.00 | $3,937.50 |
| Grand Total | | | $19,583.63 | $312.93 | $232.12 | $127.55 | $0.00 | $20,256.23 |

The values are not vested and will not be paid if your employment terminates for any reason other than Retirement (as defined in Growth Award Plan Doc.) or Rule 65 prior to the date on which your Awards become vested.

All Growth awards are payable in the month of February following the vesting date.

Questions:
Please consult your Manager and/or GWM Compensation @ 609-274-6777.

# Exhibit 5

# FA Capital Accumulation Award

**03/13/2009 Fair Market Value: $6.05**

JACK BURNETTE
2425 VESTAVIA DRIVE
BIRMINGHAM, AL 35216

Employee ID (9 digit): 000617078
Employee ID (5 digit): 2286Y

## Original Awards

| | Original Award * | Minimum Value * | Share Value * | Account Value * |
|---|---|---|---|---|
| | Original Award | Interest To 03/13/2009 | 03/13/2009 Minimum Value | Number of BAC Shares Awarded | BAC Shares Value at $6.05 | Account Value 03/13/2009 |

| Cumulative Total Awards Through 03/13/2009 | $33,598.84 | $0.00 | $0.00 | 771 | $4,664.55 | $4,664.55 |
|---|---|---|---|---|---|---|

**03/13/2009 Fair Market Value: $6.05** | JACK BURNETTE | Employee ID (9 digit): 000617078

## Original Awards

| Performance Period | Award Type — Original Award | Original Award * | Share Price | Interest To 03/13/2009 | 03/13/2009 Minimum Value | Number of BAC Shares Awarded | BAC Shares Value at $6.05 | 03/13/2009 Account Value | Vesting Date |
|---|---|---|---|---|---|---|---|---|---|
| 2005 | Prod | $13,070.64 | $78.7027 | $0.00 | $0.00 | 166 | $1,004.30 | $1,004.30 | 12/31/2013 |
| Total | | $13,070.64 | | $0.00 | $0.00 | 166 | $1,004.30 | $1,004.30 | |
| 2006 | Prod | $2,458.20 | $108.7434 | $0.00 | $0.00 | 23 | $139.15 | $139.15 | 12/31/2014 |
| 2006 | 1.5% Award | $683.23 | $108.7434 | $0.00 | $0.00 | 6 | $36.30 | $36.30 | 12/31/2014 |
| Total | | $3,151.43 | | $0.00 | $0.00 | 29 | $175.45 | $175.45 | |
| 2007 | Prod | $3,158.59 | $61.6870 | $0.00 | $0.00 | 52 | $314.60 | $314.60 | 12/31/2015 |
| 2007 | 1.5% Award | $896.15 | $61.6870 | $0.00 | $0.00 | 15 | $90.75 | $90.75 | 12/31/2015 |
| 2007 | FOG | $8,256.00 | $62.0186 | $0.00 | $0.00 | 133 | $804.65 | $804.65 | 12/31/2015 |
| Total | | $12,310.74 | | $0.00 | $0.00 | 200 | $1,210.00 | $1,210.00 | |
| 2008 | RSU Prod | $4,014.84 | $13.4900 | $0.00 | $0.00 | 298 | $1,802.90 | $1,802.90 | 12/31/2016 |
| 2008 | RSU 1.5% Award | $1,051.19 | $13.4900 | $0.00 | $0.00 | 78 | $471.90 | $471.90 | 12/31/2016 |
| Total | | $5,066.03 | | $0.00 | $0.00 | 376 | $2,274.80 | $2,274.80 | |
| Cumulative Total: | | $33,598.84 | | $0.00 | $0.00 | 771 | $4,664.55 | $4,664.55 | |

This statement summarizes certain features of your awards. In case of any conflict between the information in this statement and the FACAAP plan document, the Key Associate Stock Plan document or any award agreement, the plan document and award agreement will control. The design of equity awards is reviewed periodically and is subject to revision at the discretion of the company.

The values are not vested and will not be paid if your employment terminates for any reason other than Retirement (as defined in FACAAP Plan Doc.) or Rule 65 prior to the date on which your Awards become vested.

For Awards prior to 2002, after vesting, you will have the right to receive the BAC shares unless the Minimum Value is greater as of the Payment Calculation Date in which case you will be paid the minimum value in cash. Commencing with the 2002 Awards and thereafter, you will only have the right to receive BAC shares once vested.

All FACAAP awards are payable in the month of January following the vesting date.

Questions:
Please consult your Manager and/or GWM Compensation @ 609-274-6777.

# Exhibit 6

# FA Capital Accumulation Award

| | | |
|---|---|---|
| 03/27/2009 Fair Market Value $7,435 | SCOTT A. CHAMBERS<br>315 FOSTER RD<br>LEEDS, AL 35094 | Employee ID (9 digit): 000069190<br>Employee ID (5 digit): 69190 |

**Original Awards**

| Original Award | Original Award | Interest To 03/27/2009 | Minimum Value 03/27/2009 Minimum Value | Number of BAC Shares Awarded | Share Value BAC Shares Value at $7,435 | Account Value 03/27/2009 Account Value |
|---|---|---|---|---|---|---|
| Cumulative Total Awards Through 03/27/2009 | $79,188.30 | $3,156.92 | $39,589.89 | 1,530 | $11,375.60 | $46,469.59 |

| 03/27/2009 Fair Market Value: $7,435 | SCOTT A. CHAMBERS | Employee ID (9 digit): 000069190 |
|---|---|---|

**Original Awards**

| Performance Period | Award Type | Original Award | Share Price | Interest To 03/27/2009 | Minimum Value 03/27/2009 Minimum Value | Number of BAC Shares Awarded | Share Value BAC Shares Value at $7,435 | Account Value 03/27/2009 Account Value | Vesting Date |
|---|---|---|---|---|---|---|---|---|---|
| 1999 | Prod | $9,804.66 | $48.2111 | $918.51 | $10,723.17 | 203 | $1,509.31 | $10,723.17 | 12/31/2009 |
| 1999 | HHI | $5,190.69 | $48.2111 | $486.24 | $5,676.93 | 108 | $802.98 | $5,676.93 | 12/31/2009 |
| Total | | $14,995.35 | | $1,404.75 | $16,400.10 | 311 | $2,312.29 | $16,400.10 | |
| 2000 | ASSET | $0.10 | $79.0808 | $0.00 | $0.10 | 0 | $0.00 | $0.10 | 12/31/2010 |
| 2000 | Prod | $10,118.98 | $79.0808 | $838.40 | $10,957.38 | 128 | $951.88 | $10,957.38 | 12/31/2010 |
| 2000 | GAP 1st Qtr | $919.52 | $49.8473 | $76.15 | $995.67 | 19 | $141.27 | $995.87 | 12/31/2010 |
| 2000 | GAP 2nd Qtr | $938.34 | $59.3004 | $77.73 | $1,016.07 | 15 | $111.53 | $1,016.07 | 12/31/2010 |
| 2000 | GAP 3rd Qtr | $855.56 | $72.5167 | $70.86 | $926.42 | 12 | $89.22 | $926.42 | 12/31/2010 |
| 2000 | GAP 4th Qtr | $891.49 | $80.0247 | $73.83 | $965.32 | 11 | $81.79 | $965.32 | 12/31/2010 |
| 2000 | MLUA NEW BUS | $5,490.25 | $76.4281 | $454.89 | $5,945.14 | 72 | $535.32 | $5,945.14 | 12/31/2010 |
| Total | | $19,214.24 | | $1,591.86 | $20,806.10 | 257 | $1,910.81 | $20,806.10 | |
| 2001 | ASSET | $1,669.00 | $61.2798 | $120.38 | $1,789.38 | 28 | $208.18 | $1,789.38 | 12/31/2011 |
| 2001 | GAP 1st Qtr | $294.85 | $85.4275 | $21.23 | $316.08 | 3 | $22.31 | $316.08 | 12/31/2011 |
| 2001 | GAP 2nd Qtr | $259.53 | $73.1937 | $18.70 | $278.23 | 3 | $22.31 | $278.23 | 12/31/2011 |
| Total | | $2,223.38 | | $160.31 | $2,383.69 | 34 | $252.80 | $2,383.69 | |
| 2002 | Prod | $6,163.26 | $45.1192 | $0.00 | $0.00 | 137 | $1,018.60 | $1,018.60 | 12/31/2010 |
| Total | | $6,163.26 | | $0.00 | $0.00 | 137 | $1,018.60 | $1,018.60 | |
| 2003 | Prod | $6,054.89 | $67.1669 | $0.00 | $0.00 | 90 | $669.15 | $869.15 | 12/31/2011 |
| Total | | $6,054.89 | | $0.00 | $0.00 | 90 | $669.15 | $869.15 | |
| 2004 | Prod | $6,699.89 | $69.7091 | $0.00 | $0.00 | 96 | $713.76 | $713.76 | 12/31/2012 |
| Total | | $6,699.89 | | $0.00 | $0.00 | 96 | $713.76 | $713.76 | |

**03/27/2009 Fair Market Value: $7.435**    SCOTT A. CHAMBERS    Employee ID (9 digit): 000089190

Original Awards

| Performance Period | Award Type | Original Award* Original Award | Share Price | Minimum Value* Interest To 03/27/2009 | Minimum Value 03/27/2009 | Share Value* Number of BAC Shares Awarded | BAC Shares Value at $7.435 | Account Value* 03/27/2009 Account Value | Vesting Date |
|---|---|---|---|---|---|---|---|---|---|
| 2005 | Prod | $6,130.03 | $78.7027 | $0.00 | $0.00 | 78 | $579.93 | $579.93 | 12/31/2013 |
| Total | | $6,130.03 | | $0.00 | $0.00 | 78 | $579.93 | $579.93 | |
| 2006 | Prod | $5,248.29 | $108.7434 | $0.00 | $0.00 | 48 | $356.88 | $356.88 | 12/31/2014 |
| 2006 | 1.5% Award | $1,490.20 | $108.7434 | $0.00 | $0.00 | 14 | $104.09 | $104.09 | 12/31/2014 |
| 2006 | FAC | $535.90 | $108.7434 | $0.00 | $0.00 | 5 | $37.18 | $37.18 | 12/31/2014 |
| Total | | $7,274.39 | | $0.00 | $0.00 | 67 | $498.15 | $498.15 | |
| 2007 | Prod | $4,267.84 | $61.6870 | $0.00 | $0.00 | 69 | $513.02 | $513.02 | 12/31/2015 |
| 2007 | 1.5% Award | $1,155.15 | $61.6870 | $0.00 | $0.00 | 19 | $141.27 | $141.27 | 12/31/2015 |
| Total | | $5,422.99 | | $0.00 | $0.00 | 88 | $654.29 | $654.29 | |
| 2008 | RSU Prod | $3,937.50 | $13.4900 | $0.00 | $0.00 | 292 | $2,171.02 | $2,171.02 | 12/31/2016 |
| 2008 | RSU 1.5% Award | $1,072.98 | $13.4900 | $0.00 | $0.00 | 80 | $594.80 | $594.80 | 12/31/2016 |
| Total | | $5,010.48 | | $0.00 | $0.00 | 372 | $2,765.82 | $2,765.82 | |
| Cumulative Total: | | $79,188.90 | | $3,156.92 | $39,589.89 | 1,530 | $11,375.60 | $46,489.59 | |

This statement summarizes certain features of your awards. In case of any conflict between the information in this statement and the FACAAP plan document, the Key Associate Stock Plan document or any award agreement, the plan document and award agreement will control. The design of equity awards is reviewed periodically and is subject to revision at the discretion of the company.

The values are not vested and will not be paid if your employment terminates for any reason other than Retirement (as defined in FACAAP Plan Doc.) or Rule 65 prior to the date on which your Awards become vested.

For Awards prior to 2002, after vesting, you will have the right to receive the BAC shares unless the Minimum Value is greater as of the Payment Calculation Date in which case you will be paid the minimum value in cash. Commencing with the 2002 Awards and thereafter, you will only have the right to receive BAC shares once vested.

All FACAAP awards are payable in the month of January following the vesting date.

Questions:
Please consult your Manager and/or GWM Compensation @ 609-274-6777.

# Exhibit B

 **CT Corporation**

**Service of Process Transmittal**
10/08/2009
CT Log Number 515545538

**TO:** Amy Eisenhardt, Attorney
Merrill Lynch
Third Party Services, Building One
4800 Deer Lake Drive
Jacksonville, FL 32246

**RE:** **Process Served in Alabama**

**FOR:** Merrill Lynch, Pierce, Fenner & Smith Incorporated (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Scott A. Chambers and John C. Burnette, on behalf of themselves and all others similarly situated, Pltfs. vs. Merrill Lynch & Co., Inc. et al. including Merrill Lynch, Pierce, Fenner & Smith, Dfts. |
| **DOCUMENT(S) SERVED:** | Notice, Summons(2 Sets), Cover Sheet, Complaint |
| **COURT/AGENCY:** | Jefferson County Circuit Court, AL<br>Case # CV-2009-903163 |
| **NATURE OF ACTION:** | Employee Litigation - Class Action - Participant's employment terminated by Merrill Lynch the failure of the company to continue to provide the Participant with benefits |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Company, Montgomery, AL |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 10/08/2009 postmarked on 10/07/2009 |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days |
| **ATTORNEY(S) / SENDER(S):** | Charles A McCallum III<br>McCallum, Hoaglund, Cook & Irby, LLP<br>905 Montgomery Highway<br>Suite 201<br>Vestavia Hills, AL 35216<br>205-824-7767 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 10/08/2009, Expected Purge Date: 10/13/2009<br>Image SOP<br>Email Notification, Amy Eisenhardt amy_eisenhardt@ml.com<br>Email Notification, Jon Shields jon_shields@ml.com |
| **SIGNED:**<br>**ADDRESS:**<br><br><br>**TELEPHONE:** | The Corporation Company<br>2000 Interstate Park Drive<br>Suite 204<br>Montgomery, AL 36109<br>334-387-7680 |

Page 1 of 1 / CH

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



**AlaFile E-Notice**

01-CV-2009-903163.00

To: MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
C/O THE CORPORATION CO.,
2000 INTERSTATE P DR, 204
MONTGOMERY, AL 36109

# NOTICE OF ELECTRONIC FILING

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

SCOTT A. CHAMBERS ET AL v. MERRILL LYNCH & CO., INC. ET AL
01-CV-2009-903163.00

The following complaint was FILED on 10/2/2009 9:17:23 AM

Notice Date:      10/2/2009 9:17:23 AM

**ANNE-MARIE ADAMS**
**CIRCUIT COURT CLERK**
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
BIRMINGHAM, AL 35203

205-325-5355
anne-marie.adams@alacourt.gov

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev 6/88 | **SUMMONS**<br>**- CIVIL -** | **Case Number:**<br>01-CV-2009-903163.00 |
|---|---|---|

## IN THE CIVIL COURT OF JEFFERSON, ALABAMA
### SCOTT A. CHAMBERS ET AL v. MERRILL LYNCH & CO., INC. ET AL

**NOTICE TO** MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, C/O THE CORPORATION CO., 2000 INTERSTATE P DR, 204, MONTGOMERY, AL 38109

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY CHARLES A MCCALLUM III

WHOSE ADDRESS IS 905 Montgomery Highway, Suite 201, VESTAVIA HILLS, AL 35216

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU. OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of   SCOTT A. CHAMBERS
   pursuant to the Alabama Rules of the Civil Procedure

| 10/2/2009 9:17:23 AM | /s ANNE-MARIE ADAMS | |
|---|---|---|
| Date | Clerk/Register | By |

| ☑ Certified mail is hereby requested | /s CHARLES A MCCALLUM III |
|---|---|
| | Plaintiff's/Attorney's Signature |

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

| Date | Server's Signature |
|---|---|

### 01-CV-2009-903163.00
SCOTT A. CHAMBERS ET AL v. MERRILL LYNCH & CO., INC. ET AL

| C001 - SCOTT A. CHAMBERS | v. | D002 - MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED |
|---|---|---|
| Plaintiff | | Defendant |



01-CV-2009-903163.00 D002

**SERVICE RETURN COPY**

| State of Alabama<br>Unified Judicial System<br><br>Form C-34  Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br><br>01-CV-2009-903163.00 |
|---|---|---|

IN THE CIVIL COURT OF JEFFERSON, ALABAMA

SCOTT A. CHAMBERS ET AL v. MERRILL LYNCH & CO., INC. ET AL

**NOTICE TO** MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, C/O THE CORPORATION CO., 2000 INTERSTATE P DR, 204, MONTGOMERY, AL 36109

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY CHARLES A MCCALLUM III

WHOSE ADDRESS IS 905 Montgomery Highway, Suite 201, VESTAVIA HILLS, AL 35216

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of    SCOTT A. CHAMBERS
 pursuant to the Alabama Rules of the Civil Procedure

| 10/2/2009 9:17:23 AM | /s ANNE-MARIE ADAMS | |
|---|---|---|
| Date | Clerk/Register | By |

| ☑ Certified mail is hereby requested | /s CHARLES A MCCALLUM III |
|---|---|
| | Plaintiff's/Attorney's Signature |

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

Date                         Server's Signature

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev.5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>01-CV-200<br>Date of Filing:<br>10/02/2009 |
|---|---|---|



## IN THE CIRCUIT OF JEFFERSON COUNTY, ALABAMA
### SCOTT A. CHAMBERS ET AL v. MERRILL LYNCH & CO., INC. ET AL

**First Plaintiff:**  ☐ Business  ☑ Individual      **First Defendant:**  ☑ Business  ☐ Individual
              ☐ Government  ☐ Other                      ☐ Government  ☐ Other

## NATURE OF SUIT:

**TORTS: PERSONAL INJURY**

☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonness
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☐ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other:

**TORTS: PERSONAL INJURY**

☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**

☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS  (cont'd)**

☐ MSXX – Birth/Death Certificate Modification/Bond Forfeiture
        Appeal/Enforcement of Agency Subpoena/Petition to
        Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP-Contempt of Court
☑ CONT-Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND- Equity Non-Damages Actions/Declaratory
        Judgment/Injunction Election Contest/Quiet Title/Sale For
        Division
☐ CVUD-Eviction Appeal/Unlawful Detainer
☐ FORJ-Foreign Judgment
☐ FORF-Fruits of Crime Forfeiture
☐ MSHC-Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB-Protection From Abuse
☐ FELA-Railroad/Seaman (FELA)
☐ RPRO-Real Property
☐ WTEG-Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP-Workers' Compensation
☐ CVXX-Miscellaneous Circuit Civil Case

**ORIGIN:**   F ☑ **INITIAL FILING**        A ☐ **APPEAL FROM**        O ☐ **OTHER**
                                        **DISTRICT COURT**

           R ☐ **REMANDED**            T ☐ **TRANSFERRED FROM**
                                        **OTHER CIRCUIT COURT**

**HAS JURY TRIAL BEEN DEMANDED?**      ☐ Yes  ☑ No

**RELIEF REQUESTED:**        ☑ MONETARY AWARD REQUESTED   ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**   MCC052        10/2/2009 9:16:08 AM        /s CHARLES A MCCALLUM III

**MEDIATION REQUESTED:**        ☐ Yes  ☑ No  ☐ Undecided



## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

|   |   |   |
|---|---|---|
| SCOTT A. CHAMBERS and JOHN C. BURNETTE, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. _____ |
| MERRILL LYNCH & CO., INC., MERRILL LYNCH, PIERCE, FENNER & SMITH, BANK OF AMERICA CORPORATION, | ) ) ) ) ) | |
| Defendants. | ) ) | |

### CLASS ACTION COMPLAINT

COME NOW Plaintiffs Scott A. Chambers and John C. Burnette on behalf of themselves and all others similarly situated, and hereby file this Class Action Complaint against Defendants Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith, Bank of America Corporation ("Defendants"), and state as follows:

### PARTIES

1.      Plaintiff Scott A. Chambers ("Chambers") is an adult citizen of Alabama and resides in Jefferson County, Alabama.  Chambers was employed as a Financial Advisor ("FA") at Merrill Lynch's Birmingham, Alabama office from October 14, 1993 to March 27, 2009.

2.      Plaintiff John C. Burnette ("Burnette") is an adult citizen of Alabama and resides in Jefferson County, Alabama.  Burnette was employed as a Financial Advisor ("FA") at Merrill Lynch's Birmingham, Alabama office from December 2, 2002 to March 13, 2009.

3.      Defendant Merrill Lynch & Co., Inc. is a financial services holding company incorporated in Delaware and headquartered in New York, whose subsidiaries provide financial and

investment services. Its subsidiary, Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated, is a full service securities firm engaged in the retail and institutional sale of securities, options contracts and various other financial products. Collectively, Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated are herein referred to as "Merrill Lynch." Merrill Lynch employs nearly 17,000 persons nationwide as Financial Advisors ("FAs" or "brokers") who sell its products and services at its offices located throughout the country, including in Birmingham, Alabama. Merrill Lynch is the country's largest provider of brokerage and brokerage-related services. Merrill Lynch is a publicly traded, Fortune 100 corporation incorporated in Delaware with retail branches across the United States.

4.      Defendant Bank of America Corporation ("Bank of America") is a financial services company incorporated in Delaware and headquartered in North Carolina that provides a wide variety of banking and investment services.[1] Collectively, Bank of America Corporation and its affiliates and subsidiaries are herein referred to as "Bank of America."

5.      On September 15, 2008, Bank of America and Merrill Lynch announced that Bank of America would acquire Merrill Lynch for approximately $50 billion in an all-stock transaction. The acquisition closed on January 1, 2009.

## FACTUAL ALLEGATIONS

6.      During the time of their employment with Merrill Lynch, Plaintiffs were eligible for and participated in deferred compensation plans established by Merrill Lynch. Specifically, on or about January 1, 2002, Merrill Lynch established a long-term incentive compensation plan for its

---

[1]Bank of America succeeded Merrill Lynch as Plaintiffs' employer and assumed liability for Merrill Lynch's unlawful conduct, as well as its own actions.

FAs entitled the "Merrill Lynch Growth Award Plan for Financial Advisors" (hereinafter the "GAP"). Under the terms of the GAP, eligible financial FAs received awards if performance criteria were met during applicable periods. The growth awards earned by FAs are vested and payable in the event of certain specified occurrences, such as death, retirement or a change in control of Merrill Lynch.

7.      As to change in control, a participant is entitled to an immediate cash distribution of the participant's entire account balance in the event there (i) is a "Change in Control" of Merrill Lynch and (ii) the participant's employment is terminated by Merrill Lynch without cause or by the participant for "Good Reason."

8.      Section 7.6(f) of the GAP defines Good Reason as follows:

> "Good Reason" shall mean a Participant's termination of his or her employment with the Company if, without the Participant's written consent, any of the following circumstances shall occur:
>
> . . .
>
> (ii) reduction by the Company of the Participant's base salary as in effect just prior to the Change in Control;
>
> . . .
>
> (iv) the failure of the Company to continue to provide the Participant with benefits at least as favorable as those enjoyed by the Participant under any of the Company's pension, life insurance, medical, health and accident disability, deferred compensation, or savings plans in which the Participant was participating at the time of the Change in Control, the taking of any action by the Company which would directly or indirectly materially or reduce any such benefits or deprive the Participant of any material benefit enjoyed by the Participant at the time of the Change in Control, or the failure by the Company to provide accordance with the Company's normal vacation policy in effect at the time of the Change in Control."

3

9.      In an addition to the GAP, Merrill Lynch also had established a deferred compensation plan named the "Financial Advisor Capital Accumulation Award Plan" (hereinafter the "FACAAP"). Under the FACAAP, eligible participants were granted awards based upon their prior year's performance. Distribution of the awards earned by FAs (as well as contributions made by FAs into the account) are vested and payable in the event of certain specified occurrences, such as death, retirement or change in control of Merrill Lynch.

10.     Like the GAP, a participant in the FACAAP is entitled to an immediate cash distribution of the participant's entire account balance in the event there (i) is a "Change in Control" of Merrill Lynch and (ii) the participant's employment is terminated by Merrill Lynch without cause or by the participant for "Good Reason."

11.     Section 9(d)(iv) of the FACAAP defines "Good Reason" as follows:

> "Good Reason" shall mean your termination of your employment with the Company if, without your written consent, any of the following circumstances shall occur:
>
> . . .
>
> (B)     a reduction by the Company of your base salary as in effect just prior to the Change in Control:
>
> . . .
>
> (D)     the failure of the Company to continue in effect any benefit or compensation plan, including, but not limited to, this Plan, the Company's retirement program, or the Company's Long-Term Incentive Compensation Plan, Employee Stock Purchase Plan, 1978 Incentive Equity Purchase Plan, cash incentive compensation, or other plans adopted prior to the Change in Control, in which you were participating at the time of the Change in Control, unless an equitable arrangement (embodied in an ongoing substitute or alternative plan) has been made with respect to such plan in connection

4

with the Change in Control, or the failure by the Company to
continue your participation therein on a least as favorable a
basis, in terms of both the amount of benefits provided and
the level of your participation relative to other participants as
existed at the time of the Change in Control; or

(E)     the failure of the Company to continue to provide you with
benefits at least as favorable as those enjoyed by you under
any of the Company's pension, life insurance, medical, health
and accident, disability, deferred compensation or savings
plan in which you were participating at the time of the
Change in Control, the taking of any action by the Company
which would directly or indirectly materially reduce any of
such benefits or deprive you of any material fringe benefit
enjoyed by you at the time of the Change in Control, or the
failure by the Company to provide you with the number of
paid vacation days to which you are entitled on the basis of
years of service with the Company in accordance with the
Company's normal vacation policy in effect at the time of the
Change in Control.

. . .

12.     Plaintiffs Chambers and Burnette were eligible for and did participate in both the

GAP and the FACAAP. The acquisition of Merrill Lynch by Bank of America constitutes a change

in control as contemplated under the terms of the GAP and FACAAP. After the acquisition of

Merrill Lynch, the FAs' compensation and benefit plans were detrimentally changed in many ways,

including, but not limited to: (i) the elimination of the GAP; (ii) the elimination of the FACAAP;

and (iii) significant detrimental charges in the amount and eligibility requirements necessary to earn

production compensation.

13.     The change in compensation and benefits plans adversely effected most, if not all,

FAs, including Chambers and Burnette.

14.     On or about March 27, 2009, Chambers resigned from Merrill Lynch for good reason,

5

as defined in the GAP and FACAAP.

15.     On or about March 13, 2009, Burnette resigned from Merrill Lynch for good reason, as defined in the GAP and FACAAP.

16.     Upon information and belief, after the change in control and detrimental changes made to FAs' compensation and benefit plans, thousands of other FAs have terminated their employment with Merrill Lynch for good reason.

17.     Defendants have failed or refused to pay Plaintiffs and other FAs amounts due under the terms of the deferred compensation plans.

18.     Defendants, and those persons with decision-making authority on behalf of the Defendants, have engaged in bad faith and are in a conflicted position in determining whether FAs are entitled to obtain distributions of their entire account balances in the GAP and the FACAAP. Further, Defendants and those persons with decision-making authority as to the deferred compensation plans owed Plaintiffs and other FAs fiduciary duties by virtue of the fact that they have exercised control and dominion over Plaintiffs' and FAs' own direct contributions into the deferred compensation accounts and have failed or refused to properly discharge those duties.

## CLASS ALLEGATIONS

19.     Plaintiffs bring this action pursuant to Rule 23 of the Alabama Rules of Civil Procedure on behalf of a class of FAs of Merrill Lynch/Bank of America in the United States who have been subjected to and harmed by Defendants' breach of the deferred compensation plans.

20.     Plaintiffs are members of the class they seek to represent. The proposed class is so numerous that joinder of all members is impracticable.

21.     There are questions of law and fact common to the class, and those questions

6

predominate over individual questions.

22.     The claims alleged by Plaintiffs are typical of the claims of the class.

23.     Plaintiffs will fairly and adequately represent and protect the interests of the class.

24.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

25.     Defendants have acted or refused to act on grounds generally applicable to the class as a whole, making injunctive and declaratory relief appropriate.

## COUNT I

### BREACH OF AGREEMENT – GAP
### (CLASS AND INDIVIDUAL CLAIM)

26.     Plaintiffs and all others similarly situated re-allege the paragraphs preceding their causes of action and incorporate them by reference as Count I of this Complaint.

27.     Plaintiffs and all other similarly situated who have left the employment of Defendants after the change in control, and who were not terminated for cause, are entitled to a cash distribution of their entire GAP account balance. Defendants have breached the agreement and the terms of the plan by failing or refusing to distribute amounts due to Plaintiffs and other similarly situated persons.

## COUNT II

### BREACH OF AGREEMENT – FACAAP
### (CLASS AND INDIVIDUAL CLAIM)

28.     Plaintiffs and all others similarly situated re-allege the paragraphs preceding their causes of action and incorporate them by reference as Count II of this Complaint.

29.     Plaintiffs and all other similarly situated who have left the employment of Defendants

7

after the change in control, and who were not terminated for cause, are entitled to a cash distribution of their entire FACAAP account balance. Defendants have breached the agreement and the terms of the plan by failing or refusing to distribute amounts due to Plaintiffs and other similarly situated persons.

### COUNT III

### BREACH OF FIDUCIARY DUTY
(CLASS AND INDIVIDUAL CLAIM)

30.   Plaintiffs and all others similarly situated re-allege the paragraphs preceding their causes of action and incorporate them by reference as Count III of this Complaint.

31.   Defendants owed Plaintiffs and all other similarly situated fiduciary duties and responsibilities in connection with compensation plans as well as with the funds Plaintiffs and FAs had contributed to their accounts. Due to a conflict of interest and for personal financial gain, Defendants and authorized decision-makers have breached their fiduciary duties by failing or refusing to make distributions due and owing to Plaintiffs and other similarly situated FAs.

### COUNT IV

### DECLARATORY AND INJUNCTIVE RELIEF

### (CLASS AND INDIVIDUAL CLAIM)

32.   Plaintiffs and all others similarly situated re-allege the paragraphs preceding their causes of action and incorporate them by reference as Count IV of this Complaint.

33.   There exists a justiciable controversy between Plaintiffs and Defendants as to the parties' rights, obligations and duties in connection with the GAP and the FACAAP. Plaintiffs request the Court take jurisdiction over the matter, and determine and declare that Plaintiffs and all

similarly situated FAs are entitled to an immediate and full distribution of their deferred compensation accounts. Plaintiffs further request such other equitable, declaratory, and injunctive relief be granted as may be necessary to compel such a distribution, including the establishment of a constructive trust, if necessary and appropriate.

### PRAYER FOR RELIEF

34.     WHEREFORE, Plaintiffs respectfully requests that this Court find in favor of them and the class and against Defendants as follows:

a.      Certify this case as a class action;

b.      Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c.      Declare that Defendants' acts, conduct, policies and practices are unlawful and constitute a breach of the deferred compensation plans;

d.      Order appropriate equitable and injunctive relief to remedy the unlawful conduct;

e.      Award Plaintiffs and all others similarly situated the full value of all compensation and benefits lost and that they will lose in the future as a result of Defendants' unlawful conduct;

f.      Award Plaintiffs and all others similarly situated punitive damages, compensatory and other damages;

g.      Award Plaintiffs and all others similarly situated prejudgment interest and attorneys fees, costs and disbursements, as provided by law;

h.      Award Plaintiffs and all others similarly situated such other make whole

9

equitable, injunctive and legal relief as this Court deems just and proper to end the unlawful conduct and fairly compensate Plaintiffs;

        i.      Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.


                                             /s/ Charles A. McCallum, III
                                           Charles A. McCallum, III

OF COUNSEL:
R. Brent Irby
McCallum, Hoaglund, Cook & Irby, LLP
905 Montgomery Highway
Suite 201
Vestavia Hills, Alabama 35216
Telephone: (205)824-7767
Facsimile: (205)824-7768
Email: cmccallum@mhcilaw.com
       birby@mhcilaw.com

## Please serve Defendants via Certified Mail/Return Receipt Requested as follows:

Merrill Lynch & Co., Inc.
c/o The Corporation Company, Registered Agent
2000 Interstate Park Drive, Suite 204
Montgomery, Alabama 36109

Merrill Lynch, Pierce, Fenner & Smith Incorporated
c/o The Corporation Company, Registered Agent
2000 Interstate Park Drive, Suite 204
Montgomery, Alabama 36109

Bank of America Corporation
c/o The Corporation Company, Registered Agent
2000 Interstate Park Drive, Suite 204
Montgomery, Alabama 36109



**ANNE-MARIE ADAMS, CLERK**
JEFFERSON COUNTY CIRCUIT COURT
CIVIL DIVISION - ROOM 400
716 NO. RICHARD ARRINGTON BLVD.
**BIRMINGHAM, ALABAMA 35203**

CERTIFIED MAIL

7009 1680 0003 1735 9605

UNITED STATES POSTAGE
PITNEY BOWES
02 1A
0004621147
$ 05.880
OCT 07 2009
MAILED FROM ZIP CODE 35203