UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SCOTT A. CHAMBERS and JOHN C. BURNETTE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MERRILL LYNCH & CO., INC., MERRILL LYNCH, PIERCE, FENNER & SMITH, and BANK OF AMERICA CORPORATION,<br><br>Defendants. | 10-CV-07109 (AJN) |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

Charles A. McCallum III (*pro hac vice*)
cmccallum@mhcilaw.com
R. Brent Irby (*pro hac vice*)
birby@mhcilaw.com
MCCALLUM, HOAGLUND, COOK
  & IRBY, LLP
905 Montgomery Highway,
Suite 201
Vestavia Hills, Alabama 35216
Tel: (205) 824-7767

- and -

Paul J. Hanly, Jr.
phanly@hanlyconroy.com
Andrea Bierstein
abierstein@hanlyconroy.com
HANLY CONROY BIERSTEIN SHERIDAN
  FISHER & HAYES LLP
112 Madison Ave., 7th Floor
New York, New York 10016
Tel:  (212) 784-6400

Attorneys for Plaintiffs

August 15, 2012

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES.................................................................................................... III

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 3

    Financial Advisor Compensation ................................................................................ 3

    The Change in Control and the New Compensation Plans ........................................ 6

    The Named Plaintiffs and the Litigation ................................................................... 7

    The Settlement ........................................................................................................... 9

THE PROPOSED CLASS ...................................................................................................... 12

APPLICABLE LEGAL STANDARDS ..................................................................................... 13

ARGUMENT ...................................................................................................................... 14

    I.    THE REQUIREMENTS FOR CONDITIONAL CERTIFICATION OF THE SETTLEMENT
            CLASS HAVE BEEN MET ............................................................................... 14

            A.    The Class Is So Numerous that Joinder Is Impracticable ................. 14

            B.    The Claims of the Class Members Present Common Questions ..... 15

            C.    Plaintiffs' Claims Are Typical ........................................................... 16

            D.    Plaintiffs Will Fairly and Adequately Represent the Class.............. 17

            E.    The Requirements of Rule 23(b)(3) Are Satisfied ............................ 17

                   1.    *Common Questions Predominate Over Individual Ones* ........... 17

                   2.    *A Class Action Is the Superior Means of Adjudicating This
                        Dispute* ........................................................................................ 18

    II.    THIS COURT SHOULD APPOINT CHARLES A. MCCALLUM, III, R. BRENT IRBY,
            PAUL J. HANLY, JR. AND ANDREA BIERSTEIN AS CLASS COUNSEL ................... 19

    III.    THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT AS FAIR,
            REASONABLE, AND ADEQUATE ........................................................................ 21

      A.    The Proposed Settlement is the Result of Well Grounded, Good Faith, Arm's-Length Negotiations ........................................................ 22

      B.    The Proposed Settlement Falls Within the Range of Reasonableness and Merits Issuance of Notice and a Hearing on Final Approval ..................................................................... 23

IV.    THE PROPOSED NOTICE TO THE CLASS IS THE BEST NOTICE PRACTICABLE UNDER THE CIRCUMSTANCES ............................................................. 24

V.    THIS COURT SHOULD SCHEDULE A FAIRNESS HEARING AND SET DEADLINES FOR NOTICE, OPT-OUTS, OBJECTIONS AND OTHER RELATED MATTERS .......... 26

CONCLUSION ...................................................................................... 26

# TABLE OF AUTHORITIES

*Page*

## Cases

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).................................................. 14, 18

*Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999)................................... 16

*Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473 (2d Cir. 1995) .................................................. 15

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006)................................................... 13

*General Telephone Co. v. Falcon*, 457 U.S. 147 (1982)......................................................... 16

*In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008) ................................................ 19

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011) .......... 17

*In re Nasdaq Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99 (S.D.N.Y. 1997) ..................... 13, 14

*In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474 (2d Cir. 2008) ................................. 17

*Jones v. Am. Gen. Life & Acc. Ins. Co.*, 213 F.R.D. 689 (S.D. Ga. 2002)................................. 15

*Levinson v. About.com, Inc.*, 2009 WL 1026021 (S.D.N.Y. Apr. 13, 2009)............................. 15

*Marisol A. ex rel. Forbes v. Giuliani*, 126 F.3d 372 (2d Cir. 1997)...................................... 15, 16

*Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993) ............................................................. 14, 16

*Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147 (2d Cir. 2001) .................................. 16

*Rodolico v. Unisys Corp.*, 199 F.R.D. 468 (E.D.N.Y. 2001) .................................................... 18

## Statutes, Rules, and Regulations

Fed. R. Civ. P. 23......................................................................................................... 14, 17, 20

Fed. R. Civ. P. 23(a)(1) ...................................................................................................... 14

Fed. R. Civ. P. 23(a)(3) ...................................................................................................... 16

Fed. R. Civ. P. 23(b)(3) ...................................................................................................... 18

Fed.R.Civ.P. 23(g)............................................................................................................ 19

## Other Authorities

Manual for Complex Litigation (4th Ed. 2004) ..................................................................... 13

McLaughlin on Class Actions (8th Ed.) .......................................................................... 13, 14

Plaintiffs submit this Memorandum of Law of support of their motion for preliminary approval of the class-wide settlement reached in this case.

## INTRODUCTION

After nearly three years of litigation, substantial discovery, and months of negotiation, the parties, Plaintiffs Scott A. Chambers and John C. Burnette ("Named Plaintiffs) and Defendants Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith, and Bank of America Corporation (collectively, "Merrill") have entered into a Stipulation of Settlement[1] and reached a proposed settlement that resolves all claims asserted in this action.  This Settlement will resolve a controversy that began in the fall of 2008, with the merger between Bank of America Corporation ("BoA") and Merrill Lynch & Co., Inc. ("Merrill Lynch"). The merger constituted a "change of control" within the meaning of certain compensation plans for Merrill Lynch Financial Advisors that were then in effect at Merrill Lynch.  The plans involved awards that were made, but not paid out for a period of some years.  The plans provided for accelerated vesting and payout of awards if, following a change in control, a Financial Advisor[2] voluntarily terminated employment "for good reason."   Without the "good reason" trigger, unvested awards would, in most circumstances, be forfeited upon voluntary departure. After the change in control, Merrill made changes to its compensation system.  Certain Financial Advisors who left Merrill after the merger asserted that, for various reasons including the changes to the compensation system, they were entitled to payouts under the "good reason" clause in the plans; Merrill disagreed and denied "good reason" claims.  This lawsuit followed.

---

[1] The Stipulation is attached hereto as Exhibit "A."

[2] This Memorandum of Law incorporates by reference the definitions in the Stipulation of Settlement dated _____ __, 2012 (the "Stipulation"), and all capitalized terms used, but not defined herein, shall have the same meanings as in the Stipulation of Settlement.

Throughout the litigation, Merrill has insisted that the departing Financial Advisors did not leave for "good reason" within the meaning of the compensation plans; that no accelerated vesting was triggered; and that no payments were owed. Merrill has vigorously contested "good reason" claims. In order to settle this dispute, however, Merrill has now agreed to pay a class of Financial Advisors a significant portion of the awards that had accumulated in the plans. Under the terms of the Settlement, the former Financial Advisors will receive their payments promptly and in cash. Although the Settlement does not resolve the claims of the highest paid Financial Advisors who left Merrill, it resolves the claims of approximately 1,467 Financial Advisors, all of whom it is alleged were similarly affected by certain changes at Merrill that followed the change in control and thus are similarly situated with respect to the claims asserted here.

In order to effectuate this Settlement, Plaintiffs now seek conditional certification of the settlement class, appointment of class counsel, preliminary approval of the settlement, approval of the proposed form and manner of notice to the class, and an order (a) setting deadlines for the class notice and for class members to opt-out or object, and (b) scheduling a fairness hearing for the Court to consider final approval of the settlement.[3] As described below, the class should be conditionally certified and class counsel appointed because all the requirements for such certification under Rule 23(a) and Rule 23(b) have been met. This Court should further preliminarily approve the proposed Settlement, which provides immediate and substantial benefit to all class members.

--------

[3] Merrill joins in seeking preliminary approval of the settlement, and takes no position (but does not oppose) with respect to conditional certification of the settlement class and appointment of class counsel.

## STATEMENT OF FACTS

**Financial Advisor Compensation**

Under the compensation system in effect at Merrill prior to January, 2009, a Financial Advisor's compensation (excluding insurance benefits) had three components: (1) cash compensation; (2) participation in long-term contingent compensation; and (3) other compensation-based awards.  The primary determinant of all three components was the "production credit" – credit given for commissions earned on transactions for which the Financial Advisor (or "FA") was deemed responsible.  Hanly Cert., Ex. 2.[4]

The first component, cash compensation, was computed as a percentage of the production credits generated by the FA that year.  (*Id.* at 3.)  The percentage varied with the FA's overall level of production credit:  the greater the total production credit, the greater the percentage of that credit that was awarded as cash compensation.  Cash compensation also depended on the type of transaction that generated the commission, although for all types of transactions, a higher percentage was awarded to FAs with higher total production credit.  (*Id.*)  A compensation matrix for each year, called a "payout grid," showed the percentage of production credits awarded for each type of transaction at each level of overall production credit.

The long-term contingent compensation involved participation in one or more of three plans:  the Merrill Lynch Financial Advisor Capital Accumulation Award Plan, known as "FACAAP"; the Merrill Lynch Growth Award Plan for Financial Advisors, referred to as "GAP"; and the Wealthbuilder Account Plan, referred to as "Wealthbuilder" (together FACAAP, GAP, and Wealthbuilder are sometimes referred as the "Plans").  Under the Plans, compensation was awarded, but not immediately

---

[4] The certification of Paul J. Hanly, Jr. was filed on April 6, 2012 in Support of Plaintiffs' Motion for Class Certification.

paid out, and did not vest for several years:  a Financial Advisor had to remain at Merrill until the money vested in order to receive it.

Under FACAAP, FAs received as additional compensation a specified percentage of their production; as with cash compensation, the percentage varied with the level of production credit.  Hanly Cert., Ex. 2 at 3, 5, 18-19.  The awards were converted into Merrill stock and appreciated (or not) along with the stock.  Under ordinary circumstances, awards in FACAAP began vesting after five years and were fully vested after ten years.  *Id.*; Hanly Cert., Ex. 3.   GAP provided a different kind of benefit.  Awards under this plan were made in cash, rather than stock.  There was no set formula for GAP awards.   Awards under GAP generally vested fully after four years, but not at all before then.  Hanly Cert., Ex. 2 at 7-10, 27.  Like GAP, awards under Wealthbuilder were credited in cash and participants were allowed to select from certain benchmark and cash equivalent funds to earn returns.   Awards under Wealthbuilder generally vested after twenty (20) years of service or at certain age and service intervals.  Wealthbuilder ¶¶5.2, 8.1.

All three of the Plans contained protections for FAs in the event of a change in control at Merrill, such as the BoA acquisition that gives rise to this litigation.  The Plans provided for immediate payout following a change in control if a participant's employment was terminated under one of two circumstances:  (a) by Merrill, without cause; or (b) by the participant, for "Good Reason," as defined in the Plans.  The Plans thus ensured that, while ordinarily, FAs would have to continue on at Merrill in order to receive their contingent compensation, they would not lose their previously-awarded contingent compensation because of a departure that was neither their fault nor their choice.

4

The Plans all contained similar[5] "Good Reason" triggers that provided grounds for a payout in the event of a change in control shared by the Plans:

> (i) a meaningful and detrimental alteration in the Participant's position or in the nature or status of the Participant's responsibilities from those in effect immediately prior to the Change in Control;

> (ii) a reduction by the Company of the Participant's base salary as in effect just prior to the Change in Control;

> (iii) the relocation of the office of the Company where the Participant was employed at the time of the Change in Control (the "CIC Location") to a location more than fifty miles away from the CIC Location (except for required travel on the Company's business to an extent substantially consistent with the Participant's business travel obligations just prior to the Change in Control); or

> (iv) the failure of the Company to continue to provide the Participant with benefits at least as favorable as those enjoyed by the Participant under any of the Company's pension, life insurance, medical, health and accident disability, deferred compensation or savings plans in which the Participant was participating at the time of the Change in Control, the taking of any action by the Company which would directly or indirectly materially reduce any of such benefits or deprive the Participant of any material fringe benefit enjoyed by the Participant at the time of the Change in Control, or the failure by the Company to provide accordance with the Company's normal vacation policy in effect at the time of the Change in Control.

GAP ¶ 7.6(f); FACAAP ¶ 9(d)(iv); Wealthbuilder ¶8.4(f).   The additional trigger in both FACAAP and Wealthbuilder provided:

> the failure of the Company to continue in effect any benefit or compensation plan, including, but not limited to, this Plan, the Company's retirement program, or the Company's Long-Term Incentive Compensation Plan, Employee Stock Purchase Plan, 1978 Incentive Equity Purchase Plan, cash incentive compensation or other plans adopted prior to the Change in Control, in which you are participating at the time of the Change in Control, unless an equitable arrangement (embodied in an

---

[5] The wording of the "Good Reason" triggers in the Plans are not completely identical because GAP and Wealthbuilder are written in the third person and refer to "the Participant," while FACAAP is written in the second person, and so addresses the participant directly as "you."

> ongoing substitute or alternative plan) has been made with respect to such plan in connection with the Change in Control, or the failure by the Company to continue your participation therein on at least as favorable a basis, in terms of both the amount of benefits provided and the level of your participation relative to other participants, as existed at the time of the Change in Control. . . .

FACAAP ¶ 9(d)(iv)(D); Wealthbuilder ¶8.4(f)(iv).  Plaintiffs allege that the necessary conditions were triggered by, among other things, the new compensation plan put into effect for 2009, following a change in control at Merrill.

**The Change in Control and the New Compensation Plans**

On September 15, 2008, BoA and Merrill Lynch entered in a merger agreement. Pursuant to that agreement, Merrill Lynch was sold to BoA for 0.8595 shares of BoA common stock for each Merrill common share, valued at $50 billion or $29 per share. The announced merger was subject to the approval of BoA's shareholders; it was scheduled to be, and was, finalized on January 1, 2009.[6]   It is undisputed that BoA's acquisition was a Change in Control within the meaning of the Plans.

On December 18, 2008, BoA announced its 2009 compensation plan for Merrill, which involved certain changes to all three aspects of Financial Advisor compensation: the cash incentive compensation; the long-term contingent compensation; and the ancillary benefits.  Hanly Cert., Ex. 7.  First, the 2009 compensation plan established a new payout grid with changes that allegedly affected lower-level producers, those with production credits under $500,000.  The 2009 compensation plan also made changes to long-term contingent compensation:  all three Plans were eliminated and two new types of long-term contingent compensation were offered instead.  These were the "Key Associate Stock Plan" ("Stock Plan") and the "WealthChoice Contingent Award Plan"

---

[6] Under the terms of the Plans, the signing of the merger agreement was sufficient to trigger the "Change in Control" provisions and the Change in Control was "deemed to have occurred as of the date of the execution of such agreement."  *See* FACAAP ¶ 9(d)(iii);  GAP ¶ 7.6(c); Wealthbuilder ¶8.4(c).

("WealthChoice Plan").   (*Id*.)   The new plans were different from – and in Plaintiffs'
view, decidedly less favorable than – the prior Plans that were replaced.

The 2009 compensation plan also made changes to FA's receipt of other awards
and benefits.   For example, the 2009 plan increased the required thresholds for FAs to
earn "Recognition Clubs" status and awards. Likewise, the firm's "Market Error"
policy, which makes up part of an FA's overall compensation, was changed. Also, in
2009, FAs were no longer entitled to receive any production credit at all for revenues
generated from small households (clients with asset levels between $50,000 to $100,000).
At the same time, the 2009 plan provided that production credit on revenues generated
from client money market accounts was decreased by 50%.

**The Named Plaintiffs and the Litigation**

Plaintiff Scott Chambers went to work for Merrill, in its Birmingham, Alabama,
office in 1993 as a financial advisor trainee.   After successfully completing the training
program, he became a financial advisor.   In November, 2008, the value of Chambers'
production credits was projected to be $194,994 for the year; had the 2009 compensation
plan been in effect in 2008, Chambers's projected annual production credits would have
been computed as $193,667.   Chambers resigned his position at Merrill on March 27,
2009.   On April 21, 2009, he wrote to Merrill requesting "Good Reason" payouts.
Merrill denied his claim.

Plaintiff John Burnette went to work for Merrill in 2002 as a trainee FA in the
Birmingham, Alabama office.   He successfully completed the training program and
became a financial advisor. In November, 2008, Merrill projected the value of Burnette's
production credits for 2008 as $202,938; had the 2009 compensation plan been in effect
in 2008, Burnette's projected production credits would have been computed as $202,394.
Hanly Cert., Ex. 20.   Burnette resigned his position at Merrill on March 13, 2009.   On
April 16, 2009, he wrote to Merrill requesting "Good Reason" payouts.   Merrill denied
his claim.

Chambers and Burnette were not the only Financial Advisors who resigned. In all, more than 2,000 FAs left Merrill after September 15, 2008 who had production credits that were less than $500,000.  Many of those departing FAs sought "good reason" payouts under the Plans in issue.  All such requests were denied.

On October, 2, 2009, Chambers and Burnette commenced this action in the Circuit Court of Jefferson County, Alabama, on behalf of themselves and all others similarly situated, seeking payout of their unvested awards in the Plans. Merrill removed the action to the United States District Court for the Northern District of Alabama.  Plaintiffs sought to have the case remanded, but their motion was denied. Merrill then sought transfer under 28 U.S.C. § 1404.  Plaintiffs opposed the motion, but on September 3, 2010, the Alabama court granted the motion and transferred the action to this Court.

In defending the action, Merrill has raised numerous defenses, including that: (a) no class could be certified because the "good reason" triggers in the Plans required individualized determinations; and (b) various changes, including but not limited to changes in the 2009 compensation plan, were not such as to trigger "good reason" for any Financial Advisor.  Plaintiffs contended that:  (a) the individualized determinations were not necessary to establish class wide liability under the Plans; and (b) various changes, including the overall structural changes to compensation following the change of control, triggered the "good reason" clauses systemically for certain Financial Advisors.  Plaintiffs believed that, with respect to the latter question, there was substantial overlap between the issues to be addressed in connection with class certification and the issues to be addressed in connection with resolution of the merits of Plaintiffs' claims.

The parties disagreed about the scope of discovery.  Because of the overlap between class certification issues and merits issues, Plaintiffs sought to take substantial discovery in advance of filing their motion for class certification, while Merrill argued

that the class certification motion should be heard promptly without the need for discovery, or with at most very limited discovery.  In the end – and after presentation of certain discovery disputes to the Court – Merrill produced more than 90,000 pages of documents, responded to two sets of interrogatories, and provided a summary compilation of data with respect to additional information.  Plaintiffs took depositions of five Merrill employees, one of whom was examined twice.  Merrill took depositions of both Named Plaintiffs.

Plaintiffs served their motion for class certification on April 6, 2012. The motion was supported by four affidavits or certifications (including one from an expert) and more than 30 exhibits.  Merrill stated its intention to vigorously oppose the motion. Because of ongoing settlement negotiations, the parties requested that Merrill's time to respond to the class certification motion be extended.  At the time the parties reached their settlement, Merrill's opposition had not been filed.  There was a pending dispute, however, about whether any portion of Plaintiffs' motion should be filed under seal.

**The Settlement**

The parties began negotiating a possible settlement of this action in February 2011.  Negotiations were unsuccessful and the parties resumed litigation. There were periodic settlement discussions over the next year, none of which were successful.  In the spring of 2012, the parties began a new round of settlement discussions. This time, after several months of negotiation, the parties were able to reach agreement on the terms of settlement.  Finally, the parties have entered into a signed Stipulation for which they now seek preliminary approval.

Under the terms of the Stipulation, the proposed Class consists of the following:

individuals who were employed by Merrill Lynch in the position of Financial Advisor (as defined in the Stipulation at Paragraph 1.17 of Section V), in the United States who: (a) held the position of Financial Advisor at Merrill Lynch on September 15, 2008; (b) participated in one or more of the Plans; (c) voluntarily terminated employment (excluding retirements) at Merrill Lynch during the period from September 15, 2008

through and including June 30, 2012 (the "Class Period") while holding the position of Financial Advisor at the time employment was terminated and had unvested awards in one or more of the Plans at the time of their voluntary terminations; (d) had 2008 Production Credits (as defined in the Stipulation at Paragraph 1.60 of tSection V) of $500,000 or less and (e) did not sign and/or accept the original or amended ATP.

Stipulation ¶ 1.5.   Plaintiffs Chambers and Burnette are the proposed Class Representatives.  Stipulation ¶ 1.9.  Proposed Class Counsel are Charles A. McCallum, III, R. Brent Irby with the firm of McCallum, Hoaglund, Cook & Irby, LLP, Paul J. Hanly, Jr., and Andrea Bierstein with the firm of Hanly, Conroy, Bierstein, Sheridan, Fisher & Hayes, LLP.  Stipulation ¶ 1.6.

The Settlement provides for substantial relief to class members in the form of cash compensation in the range of:  (a) 40% to 60% of Class Members' Plan Values as of the date of Class Members' voluntary termination of employment for awards in years prior to and including 2008; and (b) 16% to 24% for Plan Values awarded in 2009. Stipulation ¶ 3.  There are over 1,669 Class Members.  McCallum Aff., 6.[7]  There are slight variations in the amounts Class Members will receive based upon factors that are readily ascertainable, such as:  (a) whether a Class Member has previously made efforts to seek payment of the amounts claimed under the Plans; and (b) when the Class Member voluntarily terminated employment for good reason.  McCallum Aff., 7.  The specific formula for the settlement consideration of Class Members is set forth at ¶ 3 of the Stipulation:

> (a)    If, based upon Defendants' records, a Class Member filed a legal action or arbitration on or before June 30, 2012 against one or more of the Defendants relating to his or her alleged voluntary termination for "Good Reason" and voluntarily terminated his or her employment on or before June 30, 2010, that

---

[7] The Affidavit of Charles A. McCallum, III is attached hereto as Exhibit "B" and referenced as "McCallum Aff., ___."  The Affidavit of McCallum filed on April 16, 2012 in Support of Plaintiffs' Motion for Class Certification shall be referenced as "McCallum April Aff., ___."

Class Member's Settlement Sum = (60% of the Plan Values awarded in the years prior to and including 2008) plus (24% of the Plan Values awarded in 2009, if the Class Member resigned on or after February 13, 2009).

(b)     If, based upon Defendants' records, a Class Member filed a legal action or arbitration on or before June 30, 2012 against one or more of the Defendants relating to his or her alleged voluntary termination for "Good Reason" and voluntarily terminated his or her employment after June 30, 2010, that Class Member's Settlement Sum = (50% of the Plan Values awarded in the years prior to and including 2008) plus (20% of the Plan Values awarded in 2009, if the Class Member resigned on or after February 13, 2009).

(c)     If, based upon Defendants' records, a Class Member sent a Demand (but did not file a legal action or arbitration) to one or more of the Defendants on or before June 30, 2012 and voluntarily terminated his or her employment on or before June 30, 2010, that Class Member's Settlement Sum = (50% of the Plan Values awarded in the years prior to and including 2008) plus (20% of the Plan Values awarded in 2009, if the Class Member resigned on or after February 13, 2009).

(d)     If, based upon Defendants' records, a Class Member sent a Demand (but did not file a legal action or arbitration) to one or more of the Defendants on or before June 30, 2012 and voluntarily terminated his or her employment after June 30, 2010, that Class Member's Settlement Sum = (40% of the Plan Values awarded in the years prior to and including 2008) plus (16% of the Plan Values awarded in 2009, if the Class Member resigned on or after February 13, 2009).

(e)     If, based upon Defendants' records, a Class Member did not file a legal action or arbitration on or before June 30, 2012 against one or more of the Defendants relating to his or her alleged voluntary termination for "Good Reason" or did not send a Demand to one or more of the Defendants on or before June 30, 2012 and voluntarily terminated his or her employment on or before June 30, 2010, that Class Member's Settlement Sum = (50% of the Plan Values awarded in the years prior to and including 2008) plus (20% of the Plan Values awarded in 2009, if the Class Member resigned on or after February 13, 2009).

(f)     If, based upon Defendants' records, a Class Member did not file a legal action or arbitration on or before June 30, 2012 against one or more of the Defendants relating to his or her alleged voluntary termination for "Good Reason" or did not send a

Demand to one or more of the Defendants on or before June 30, 2012 and voluntarily terminated his or her employment after June 30, 2010, that Class Member's Settlement Sum = (40% of the Plan Values awarded in the years prior to and including 2008) plus (16% of the Plan Values awarded in 2009, if the Class Member resigned on or after February 13, 2009).

The aggregate cash settlement value to the Class is approximately $40,210,000.00. McCallum Aff., 7.  Participating Claimants who previously sought payment under the Plans will automatically receive cash compensation pursuant to the Settlement Formula. McCallum Aff., 11.  Class Members who previously have not sought payment under the Plans will be required to submit a simple request for payment.  *Id.*

In addition to the settlement consideration to participating Class Members, Defendants will pay the cost of notice and administration of the settlement and have further agreed to pay the Class Representatives an enhancement award of up to $20,000 each as may be approved by the Court.  Stipulation ¶¶ 11.6, 12.1.  These payments will not reduce the benefits otherwise available to participating Class Members.  McCallum Aff., 10.  The Settlement further provides that Class Counsel will seek an award of attorneys' fees and expenses not to exceed 25% of the settlement consideration made available to participating Class Members.  Stipulation ¶ 11.1; McCallum Aff., 9.  In exchange for the consideration noted above, participating Class Members will be deemed to have released all claims related to the Plans at issue.  Stipulation ¶ 9.

## THE PROPOSED CLASS

Plaintiffs seek conditional certification, for settlement purposes, of the following Class:

Individuals who were employed by Merrill Lynch in the position of Financial Advisor (as defined in the Stipulation at Paragraph 1.17 of Section V), in the United States who: (a) held the position of Financial Advisor at Merrill Lynch on September 15, 2008; (b) participated in one or more of the Plans; (c) voluntarily terminated employment (excluding retirements) at Merrill Lynch during the period from September 15, 2008 through and including June 30, 2012 (the "Class Period") while holding the position of Financial Advisor at the time employment was terminated

and had unvested awards in one or more of the Plans at the time of their voluntary terminations; (d) had 2008 Production Credits (as defined in the Stipulation at Paragraph 1.60 of tSection V) of $500,000 or less and (e) did not sign and/or accept the original or amended ATP.

Excluded from the Class are any and all Financial Advisors who have, on or before the Stipulation Execution Date, entered into a settlement agreement with one or more of the Defendants and/or the Releasees in which they released any claim against any of the Defendants relating to the alleged voluntary termination of their employment with Merrill for "Good Reason" under one or more of the Plans following the merger that was consummated on January 1, 2009 pursuant to the September 15, 2008 merger agreement between BoA and Merrill Lynch.

## APPLICABLE LEGAL STANDARDS

Preliminary approval is the first in a two-step process before a class action settlement may be approved. *See* 2 McLaughlin on Class Actions § 6:7 (8th Ed.) ("McLaughlin"). *See also* Manual for Complex Litigation § 21.632 (4th Ed. 2004). "First, counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation." *Id.* Once the court grants preliminary approval, and notice is provided to the class, the court conducts a fairness hearing to consider final approval of the proposed settlement. McLaughlin § 6:7; *see also In re Nasdaq Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997).

Where, as here, no class has as yet been certified, the court may consider class certification at the same time as it considers preliminary approval of the settlement. "If the case is presented for both class certification and settlement approval, the certification hearing and preliminary fairness evaluation can usually be combined." *See* Manual for Complex Litigation (4th Ed. 2004) § 21.632. The Second Circuit has held that a district court may conditionally certify a class under Rule 23 for purposes of settlement, provided that the requirements of Rule 23(a) and (b) are met. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 (2d Cir. 2006). In the context of settlement, the

court "need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997). The other requirements for certification are the same in the settlement context as outside of it.

As to approval of the settlement itself, "[a] preliminary fairness assessment is not to be turned into a trial or rehearsal for trial on the merits, as it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." 2 McLaughlin on Class Actions § 6:7 (8th Ed.). Rather, "[p]reliminary approval is an initial evaluation by the court of the fairness of the proposed settlement, including a determination that there are no obvious deficiencies such as indications of a collusive negotiation, unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, all determined on the basis of written submissions and informal presentation by the settling parties." *Id.* "Where the proposed settlement appears to be the product of serious, informed, non–collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted." *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 176 F.R.D. at 102; *accord Cohen v. J.P. Morgan Chase & Co.*, 262 F.R.D. 153, 157 (E.D.N.Y. 2009).

## ARGUMENT

## I.   THE REQUIREMENTS FOR CONDITIONAL CERTIFICATION OF THE SETTLEMENT CLASS HAVE BEEN MET

### A.   The Class Is So Numerous that Joinder Is Impracticable

Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Impracticability does not mean impossibility of joinder, but refers to the difficulty of joinder. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). Determination of practicability depends on all the

circumstances surrounding a case, not on mere numbers. The Second Circuit has held that a prospective class of forty of more raises a presumption of numerosity. *See Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

Here, Merrill's records show that the Class consists of approximately 1,669 individuals, which is more than sufficient to satisfy the numerosity requirement.

### B.   The Claims of the Class Members Present Common Questions

Rule 23(a)(2) requires that there are questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). As the Supreme Court recently explained, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart*, 131 S. Ct. at 2551. *See also Marisol A. ex rel. Forbes v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (issues of fact are common when the injuries derive from a "unitary course of conduct by a single system").  *McNeil v. New York City Hous. Auth.*, 719 F.Supp. 233, 252 (S.D.N.Y. 1989) (commonality requirement is satisfied where 'the claims of all proposed class members derive from the same… policies and procedures, and are based on the same legal theories').  The common question, moreover, "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S.Ct. at 2551.

Here,  the *Wal-Mart* standard is easily met, because the claims of all the Class Members turn on the interpretation of the Plans at issue, FACAAP, GAP and Wealthbuilder; on the change in control that occurred at Merrill in September 2008; and on certain changes, including the global changes to compensation and benefit plans for FAs put in place by BoA following the change in control.  *See Levinson v. About.com, Inc.*, 2009 WL 1026021 (S.D.N.Y. Apr. 13, 2009) (where class definition required that class members entered into one of two specified employment contracts, claim for breach of those contracts "necessarily presents a group of Plaintiffs with common issues of fact")*; Jones v. Am. Gen. Life & Acc. Ins. Co.*, 213 F.R.D. 689, 695 (S.D. Ga. 2002) (certifying as

class action claim that termination of insurance benefits breached contract because "[t]he resolution of the claim depends upon construction of contracts entered into by all putative class members with their employer. These contracts, the terms of which are contained in retirement plan documents, were not tailored to each individual employee, but were form contracts made available to the employees as a class.").

C.   **Plaintiffs' Claims Are Typical**

Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class. *See* Fed. R. Civ. P. 23(a)(3). The commonality and typicality requirements of Rule 23(a) tend to merge, as "both serve as guideposts for determining whether… the named plaintiff's claim and the class claims are so-interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Telephone Co. v. Falcon*, 457 U.S. 147, 157 (1982); *see also Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999).

Claims are considered to be typical when:

> [E]ach class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove defendant's liability. When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.

*Robidoux v. Cdelani*, 987 F.2d 931, 936-937 (2d Cir. 1993) (internal citations omitted). *See also Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001) (*quoting Marisol A.*, 126 F.3d at 376); 1 Newberg on Class Actions § 3.13 (4th ed. 2002). Typicality does not require that the factual background of the named plaintiffs' claims be identical to those of the rest of the proposed class. *See Caridad*, 191 F.3d at 293. Rather, the disputed issue of law or fact must "occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Id*.

Here, again,  the claims of the named Plaintiffs, Chambers and Burnette, are typical of the claims of the Class Members.  Chambers and Burnette were both Financial

16

Advisors on September 15, 2008 and participated in one or more of the Plans in issue. Both had production credits under $500,000 in 2008.  Each left Merrill during the requisite period, Chambers departing on March 27, 2009, and Burnette on March 13, 2009.  Neither signed or accepted the Advisor Transition Program and both had received awards under  one or more of the Plans in issue.

D.     **Plaintiffs Will Fairly and Adequately Represent the Class**

The "adequacy of representation" element in Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011).  To satisfy this requirement, "the named plaintiffs must possess the same interests and suffer the same injuries as the class members." *Literary Works in Elec. Databases*, 654 F.3d at 249.  For the same reason that the claims of Chambers and Burnette are typical of the claims of the absent Class Members, Plaintiffs submit that Chambers and Burnette are adequate representatives.  They have the same interests and suffered the same injuries as the Class Members; they have no conflicts with the class they seek to represent.

E.     **The Requirements of Rule 23(b)(3) Are Satisfied**

Plaintiffs seek conditional certification under Rule 23(b)(3), which requires the Court to determine "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23Here, both inquiries are satisfied.

1.     *Common Questions Predominate Over Individual Ones*

With respect to predominance, "a plaintiff must show that those issues in the proposed action that are subject to generalized proof outweigh those issues that are subject to individualized proof." *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 480 (2d Cir. 2008).  This inquiry, which focuses "on the legal or factual questions that qualify each class member's case as a genuine controversy . . . tests whether proposed

17

classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  In this case, the common questions in this case pertaining to Merrill's liability for Good Reason payments under the Plans in issue, as described above,  predominate over individual questions, because, as noted, the claims of all Class Members arise under the same Plans.

2.      *A Class Action Is the Superior Means of Adjudicating This Dispute*

Rule 23(b)(3) requires a court to consider whether class action is superior to alternate methods of adjudication. Factors relevant to the inquiry in the context of settlement include the interest of members of the class in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; and the desirability or undesirability of concentrating the litigation of the claims in the particular forum.  *See* Fed. R. Civ. P. 23(b)(3); *see also Amchem*, 521 U.S. at 620 (court need not consider manageability in order to certify settlement class).  These factors have been summarized as testing whether "the main objects of Rule 23 are served, namely the efficient resolution of the claims or liabilities of many individuals in a single action, as well as the elimination of repetitious litigation and possibly inconsistent adjudications."  *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 479-80 (E.D.N.Y. 2001). Consideration of the factors set forth in the rule shows that a class action provides a superior means of adjudicating the claims of the Class Members.

Given the size and geographical dispersion of the proposed Class and the likelihood that many Class Members' damages are less than the costs of pursuing individual actions, the circumstances here are precisely those for which a class action is appropriate.   It is desirable to consolidate the litigation of claims here because common legal and factual issues predominate, and the alternative – the individual adjudication of Class Members' claims – would be extremely burdensome and risk inconsistency. *See In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (class action will

avoid "disparate results, [and individual actions which] threaten to increase the costs of litigation for all parties exponentially.")

Further, a settlement this class action will have a preclusive effect, ensuring that the class action is the more efficient method of litigating these claims. *See In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 281 (S.D.N.Y. 2008) ("Courts may properly consider res judicata concerns when evaluating the Superiority Requirement with respect to a proposed class that includes foreign class members.").

## II. THIS COURT SHOULD APPOINT CHARLES A. MCCALLUM, III, R. BRENT IRBY, PAUL J. HANLY, JR. AND ANDREA BIERSTEIN AS CLASS COUNSEL

Rule 23 requires this Court, in conjunction with certifying a class, to appoint class counsel. Fed.R.Civ.P. 23(g). Here, the Court should appoint Charles A. McCallum III and R. Brent Irby with the firm of McCallum, Hoaglund, Cook & Irby, LLP and Paul J. Hanly, Jr. and Andrea Bierstein with the form of Hanly, Conroy, Bierstein, Sheridan, Fisher & Hayes, LLP as co-Class Counsel.

Rule 23 provides the factors to be considered in the appointment of Class Counsel:

Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

(A) must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class;

(B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

Fed. R. Civ. P. 23(g)(1).[8]

As set forth in the Affidavits of Charles A. McCallum III and Andrea Bierstein filed on April 6, 2012 in Support of Plaintiffs' Motion for Class Certification, proposed Class Counsel have the requisite knowledge, experience, and resources to represent the Class.  Mr. McCallum worked with the individual named Plaintiffs, investigated and identified Plaintiffs' claims, and commenced this action in Alabama.  McCallum April Aff. ¶ 5.  Following the transfer of this action to this District, both firms have devoted substantial time to the matter.  McCallum April Aff. ¶ 5; Bierstein Aff. ¶ 4.  Mr. McCallum has extensive class action experience; he has been appointed by state and federal courts as lead or co-lead counsel in more than twenty (20) statewide and national class actions.  McCallum April Aff. ¶ 3.  Ms. Bierstein, who has practiced in New York for more than 25 years and has been admitted to this Court since 1986, has extensive experience in complex litigation, including in class actions.  Bierstein Aff. ¶¶ 3 & 5.  Both firms are committed to this action and have devoted substantial resources to it.  *See* McCallum April Aff. ¶ 9; Bierstein Aff. ¶ 5.  In particular, Mr. McCallum has travelled to New York, New Jersey, North Carolina, and Pennsylvania on several occasions to attend court conferences, settlement meetings, and depositions in this case.  McCallum April Aff. ¶ 5.  Ms. Bierstein has not needed to travel to participate in the case, but both firms have shouldered the heavy burdens of time and expenses.  The affidavits submitted demonstrate that attorneys with the firms sought to be appointed are more than qualified to act as Class Counsel.

---

[8] The rule also provides that the Court "(C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs; (D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and (E) may make further orders in connection with the appointment."  Fed. R. Civ. P. 23.

### III.   THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT AS FAIR, REASONABLE, AND ADEQUATE

The Second Circuit has recognized the "strong judicial policy in favor of settlements, particularly in the class action context." *In re Painewebber Ltd. Partnerships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998).   A proposed settlement will generally be preliminarily approved "unless there are obvious defects in the notice or other technical flaws, or the settlement is outside the range of reasonableness or appears to be the product of collusion, rather than arms-length negotiation." 2 McLaughlin on Class Actions § 6:7 (8th ed.).   Moreover, "[a] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)

Approval of a proposed settlement is within the Court's discretion, to be exercised in accordance with public policy that strongly favors pretrial settlement of class action lawsuits.  *In re Interpublic Sec. Litig.*, Nos. 02-6527, 03-1194, 2004 WL 2397190, at *7 (S.D.N.Y. Oct. 26, 2004); *see also In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998).   The Court "must determine whether the terms of the proposed settlement warrant preliminary approval by making 'a preliminary evaluation' as to whether the settlement is fair, reasonable and adequate." *In re Currency Conversion Fee Antitrust Litig.*, MDL Nos. 1409, M 21-95, 2006 WL 3247396, at *5 (S.D.N.Y. Nov. 8, 2006) (citation omitted); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997). As one court has explained:

> In considering preliminary approval, courts make a preliminary evaluation of the fairness of the settlement, prior to notice.  Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval

> is granted.  Once preliminary approval is bestowed, the second step of the
> process ensues ....

*NASDAQ*, 176 F.R.D. at 102 (citations omitted); *see also In re Initial Pub. Offering Sec.*
*Litig.*, 243 F.R.D. 79, 87 (S.D.N.Y. 2007).

In essence, the Court should determine whether the settlement is "at least
sufficiently fair, reasonable and adequate to justify notice to those affected and an
opportunity to be heard." *NASDAQ*, 176 F.R.D. at 102 (citation omitted); *In re Prudential*
*Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("The Court's function now
is to ascertain whether there is any reason to notify the class members of the proposed
settlement and to proceed with a fairness hearing.") (internal quotation marks omitted).

A.      **The Proposed Settlement is the Result of Well Grounded, Good Faith,**
        **Arm's-Length Negotiations**

A presumption of fairness applies to a proposed class settlement that is the result
of arm's-length negotiations between counsel knowledgeable in complex class litigation.
*Wal-Mart Stores*, 396 F.3d at 116; *see also Leung v. Home Boy Rest., Inc.*, No. 07 Civ. 8779
(RJS) (DFE), 2009 WL 398861, *1 (S.D.N.Y. Feb. 18, 2009) (preliminary approval
appropriate where "the proposed settlement appears to be the product of extensive,
arms-length negotiations conducted by experienced counsel with input from the parties
...") The Settlement is the product of just such rigorous arm's-length negotiations.
McCallum Aff., 4.  The Settling Parties negotiated over a period of more than a year and
attended multiple in-person settlement conferences.  *Id.*

Moreover, the Settlement was reached only after completion of: (1) Plaintiffs'
initial pre-filing factual investigation; (2) the review and analysis of over 100,000 pages
of documents; (3) numerous interviews with third-party witnesses and discussions with
counsel representing similarly situated financial advisors; (4) consultations with experts
on long-term contingent compensation plans and class certification issues;
(5) depositions of the named plaintiffs and of relevant employees of the Defendants;
(6) monitoring and assessing results in related arbitration proceedings; (7) extensive

research for, preparation and filing of a motion and submission in support of class certification; and (8) intensive settlement negotiations.  McCallum Aff., 2.  Thus, the Settlement was not achieved until the settling parties had sufficient familiarity with the issues in the case to evaluate its merits and agree on a settlement framework that was both acceptable to Defendants and reasonable, fair and adequate to the Class.

> **B.    The Proposed Settlement Falls Within the Range of Reasonableness and Merits Issuance of Notice and a Hearing on Final Approval**

The proposed Settlement is well within the range of reasonableness.  The proposed settlement is an excellent result given the numerous and substantial risks faced in this litigation. In particular, Defendants have raised a number of arguments and defenses in opposition to class certification, the merits of the case, and Class Members' ability to obtain damages.  In the absence of a Settlement, the Settling Parties would present factual and expert testimony on each of these issues, and there is a risk that the Court or jury would resolve the ultimate issues of certification and liability against the Plaintiffs and the Class.

As further indicia of its reasonableness, the Settlement exhibits none of the "obvious deficiencies" that could justify denying preliminary approval.  *NASDAQ*, 176 F.R.D. at 102.  In all respects, the terms embodied in the Stipulation of Settlement are customary in nature. In particular, Plaintiffs' recovery under the settlement will be determined according to precisely the same formula as the recoveries of other Class Members, with the exception of any compensatory payment to the Class Representatives approved by the Court that will not serve to reduce the cash compensation payable to Class Members.  McCallum Aff., 10.  *See NASDAQ*, 176 F.R.D. at 102 (settlement may be approved preliminarily where it "does not improperly grant preferential treatment to class representatives or segments of the class"); Prudential, 163 F.R.D. at 209 (preliminary approval is appropriate where "preliminary evaluation of the

proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives ...").

Further, the immediate cash compensation in the rage of 40% - 60% of the value of Class Members' accounts for awards granted prior to 2009[9] is plainly reasonable given the risks attendant in pursuing further litigation. *See Strougo v. Bassini*, 258 F.Supp. 2d 254, 260 (S.D.N.Y. 2003) ("The proposed settlement provides for relief now, not some wholly speculative payment of a hypothetically larger amount years down the road."). Indeed, class action settlements that provide a far lower percentage of recovery are commonly found to be a reasonable rate of recovery that will justify the settlement of litigation. *See, e.g., Strube v. am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 698 (M.D. Fla. 2005) (approving settlement equal to 2% of estimated potential recovery); *In re General Instrument Sec. Litig.*, 209 F.Supp. 2d 423, 431-34 (E.D. Pa. 2001) (approving cash settlement representing 11% of the plaintiffs' estimated damages); *City of Detroit v. Grinnell Corp.*, 356 F.Supp. 1380, 1386 (S.D.N.Y. 1997) (finding settlement for 3.2% to 3.7% of the potential recovery "well within the ball park" of reasonableness), *aff'd in part, rev'd in part on other grounds*, 495 F.2d 448 (2d Cir. 1974). Given that the proposed settlement is the result of serious, arm's-length negotiations between the parties and has no obvious deficiencies, the Court should grant preliminary approval and direct that notice of a fairness hearing be given to Class Members. This is consistent with judicial policy highly favoring class action settlements and upholding them whenever possible.

## IV.   THE PROPOSED NOTICE TO THE CLASS IS THE BEST NOTICE PRACTICABLE UNDER THE CIRCUMSTANCES

Rule 23(c)(2)(B) provides:

---

[9] Awards granted in 2009 have been discounted in view of arguments articulated by the Defendants that question the ability to recover such awards even if liability is established. McCallum Aff., ¶7.

> For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.

Fed.R.Civ. 23(c)(2)(B). The rule further prescribes the required content of the notice, including (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class members may enter an appearance through an attorney; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment. *Id.*

In addition, with respect to any proposed settlement of a class action, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." *See also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir. 2005) ("The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness."). The Second Circuit has explained that "[t]here are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements." *Id.* at 114. Nonetheless, the settlement notice must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Id.*

Whether judged under Rule 23(c)(2)(B) or under Rule 23(e), the notice proposed here is appropriate and should be approved. *See*, Exhibit 1-A to Stipulation. Because of the prior relationship between Merrill and its former Financial Advisors, the name of each Class Member is known to Merrill, along with a recent address. Accordingly, the parties propose to provide actual, mailed notice to each Member of the Class, as prescribed by Rule 23(c)(2)(B). Because the addresses of the Class Members are of such recent vintage, the parties believe no further notice beyond the individual mailed notices is necessary or would be practicable. This is especially true because Class

Members are known to one another as former work colleagues, so that Class Members are likely to learn of the notice through additional channels anyway. Moreover, the proposed notice contains all of the information prescribed by Rule 23(c)(2)(B). It also describes the terms of the settlement and makes clear the options available to the members of the class.

## V. THIS COURT SHOULD SCHEDULE A FAIRNESS HEARING AND SET DEADLINES FOR NOTICE, OPT-OUTS, OBJECTIONS AND OTHER RELATED MATTERS

In order to effectuate the settlement, the Court should, finally, schedule a fairness hearing and set associated deadlines. The parties suggest the following schedule leading to the fairness hearing. Blanks for the actual dates are provided in the proposed Preliminary Approval Order submitted herewith:

| Event | Day |
|---|---|
| Entry of Preliminary Approval Order | Day 0 |
| Notice to be mailed on or before | Day 45 |
| Last day to opt out | Day 90 |
| Last day for objections | Day 90 |
| Final Fairness Hearing | Day 120 |

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for preliminary approval and enter the proposed order attached as Exhibit 1 to the Parties Stipulation of Settlement.

Dated: New York, New York
          August __, 2012

HANLY CONROY BIERSTEIN SHERIDAN
  FISHER & HAYES LLP


By:__/s/ Andrea Bierstein_____
Paul J. Hanly, Jr.
phanly@hanlyconroy.com
Andrea Bierstein
abierstein@hanlyconroy.com
112 Madison Avenue, 7th floor
New York, New York 10016
(212) 784-6403 (Direct)
(212) 784-6400 (Main)
(212) 784-6420 (Fax)

Charles A. McCallum III
cmccallum@mhcilaw.com
R. Brent Irby
birby@mhcilaw.com
MCCALLUM, HOAGLUND, COOK & IRBY, LLP
905 Montgomery Highway,
Suite 201
Vestavia Hills, Alabama 35216
Tel: (205)824-7767

Attorneys for Plaintiffs and the Putative Class

27